# Richmond.

## JAMES TAYLOR THORNTON v. THORNTON'S EXECUTORS, ET ALS.

### January 15, 1925.

1. TESTAMENTARY CAPACITY—*Opinion of a Non-Expert.*—When a non-expert expresses the opinion that a testator was mentally incapable of making a will his evidence is of little value, except so far as he testifies as to facts which indicate such incapacity.

2. TESTAMENTARY CAPACITY—*Evidence Held not to Show Incapacity.*—Evidence showing that the testator was a very old man, infirm, willful, and exacting of those whom he considered his dependents, and that his failing eyesight and deafness made him more dependent and less capable is insufficient to show a want of testamentary capacity.

3. TESTAMENTARY CAPACITY—*Testimony of Subscribing Witness.*—The testimony of a subscribing witness as to the testator's mental capacity is entitled to peculiar weight.

4. TESTAMENTARY CAPACITY—*Testimony of Subscribing Witness—Physicians—Case at Bar.*—In the instant case the testimony of one of the subscribing witnesses to the will was clear, full and complete. He showed that the testator not only knew the contents of the original will and the first codicil, but that he knew of his property, and that he knew of his children, and that he fully understood what he was doing. This testimony, unless overthrown, fully meets every requirement of the law. The expert testimony of testator's physicians was strongly in favor of his testamentary capacity; against this was the opinion of two non-expert witnesses that the testator was lacking in capacity, but the facts testified to by them as supporting their opinions did not, in the view of the court, support such opinion.

   *Held:* That it must be held that testator was mentally competent and that a verdict to the contrary must be set aside.

5. UNDUE INFLUENCE—*Burden of Proof.*—The burden is on the contestant of will to prove undue influence.

6. UNDUE INFLUENCE—*Definition—Species of Fraud—Evidence to show.*—Undue influence is a species of fraud and so must be proved by clear, cogent, and convincing testimony. Influence is not undue which rests upon natural affection and desire to give property to those who are most considerate, attentive, and useful to us.

7. UNDUE INFLUENCE—*No Evidence of Influence—Case at Bar.*—In the instant case, the whole theory of undue influence was based upon the fact that testator lived in the house with one of his sons, the beneficiary of the last codicil to his will, and that their relations were intimate, while the relations between him and the other son, in whose favor the will was at first made, were strained. There was not a syllable of testimony to the effect that any effort was ever exerted to induce him to change his will. Nor is there any evidence that he ever parted with a single dollar while living except of his own volition.

*Held:* That the evidence of undue influence was insufficient.

Error to a judgment of the Circuit Court of Fauquier county, in a will contest. Judgment for contestant. Proponent assigns error.

*Reversed.*

The opinion states the case.

*R. A. McIntyre, Jno. S. Barbour* and *W. H. Robertson,* for the plaintiff in error.

*J. Donald Richards, Burnett Miller* and *A. O. Weedon,* for the defendants in error.

PRENTIS, J., delivered the opinion of the court.

This is a controversy over the third codicil to the will of Thomas Thornton, deceased, dated December 1, 1919. He had made his will March 19, 1915. He thereby gave his entire estate, after the death of his wife, subject to certain legacies, to his son, Thomas Pringle Thornton (called Pringle) for life, upon condition that if Pringle should die without heirs of his body, his interest should pass to "my grandson, Thomas Thornton, son of James Taylor Thornton." He also provided that after the death of Pringle it should go to Thomas Thornton, the son of James

Taylor Thornton (called Taylor), "provided he should be the longest liver and my son Thomas Pringle should die without heirs of his body; and should my son Thomas Pringle survive my said grandson, and die without issue of his body, then I direct that said property be divided among my heirs at law as if I had died intestate, unless said grandson should have heirs of his body, in which event said property shall pass upon the death of my son Thomas Pringle, without heirs, to such heirs of my said grandson."

When the third codicil was executed in 1919 and at the time of his death, December 28, 1920, when he was about eighty-eight years old, his wife was dead and he left surviving him, five sons, Andrew, Benjamin, "Pringle," William and Taylor, the oldest of whom was more than sixty years of age, and the youngest, Taylor, about fifty-two. His only grand-children were a daughter of his son, Andrew, who did not live in Virginia, who had never visited him, and the four children of Taylor, of whom the oldest, Thomas, is mentioned both in the will and codicil. Benjamin lived in Indiana and had visited his father occasionally. · William was a Pullman car conductor and lived in Washington, D. C.

Pringle is described as weak mentally and physically, and he alone of the five sons had remained with his father, working on the farm, and evidently had been his peculiar care. After the death of the testator's wife, Pringle contracted a marriage which was not entirely pleasing to his father, and thereafter lived with his wife at his father's home. Not long before this marriage, March 31, 1917, the testator executed the first codicil, the pertinent part of which is in this language:

"I desire the property devised and bequeathed to my son, Thomas Pringle Thornton, in the sixth clause of

my will, to pass to my son James Taylor Thornton for life should he be the longest liver, and then to my grandson Thomas Thornton in remainder in fee."

So that this codicil shows an increasing interest in Taylor. The testator and the wife of Pringle were at times uncongenial. Perhaps, reading between the lines, the testator had been so accustomed to Pringle's incompetency and subserviency that he was restive under the, perhaps, naturally independent spirit of his wife. At any rate, and without undertaking to place the fault, there were many misunderstandings after the marriage, the business relations of the father and son assumed a more definite form, and first the farm was rented to Pringle for one-third of the proceeds and thereafter for one-half thereof. These misunderstandings led the testator to leave his home in Fauquier and go to live with his son, Taylor, in Prince William county. There is testimony to the effect that Pringle merely took him there and left him September 2, 1919, and also to the effect that he went there intending to make a visit of a few days duration and was expected to return promptly. At any rate, the first written contract, dated September 10, 1919, was thereupon executed leasing the farm to Pringle for one year for one-half of the crops, the father reserving one room in the house whenever he desired to occupy it. This contract also constituted his friend and neighbor, H. V. Glascock, his agent to advise and deal with Pringle. Shortly thereafter, December, 1919, while living in Taylor's home in Prince William county, he visited R. A. McIntyre, a prominent attorney in good standing at Warrenton, who had drawn both the will and previous codicil and who had them for safe keeping, and there executed the second codicil to his will, which gives rise to this controversy. That codicil reads thus:

"I give all of the property named and described in said sixth clause and codicil in my foregoing will to my son, James Taylor Thornton, in fee simple, and require of him that he pay off the legacies provided to be paid in my said will, as my son Thomas Pringle was required to do in said sixth clause of my will; and said legacies shall be a lien upon said property until paid."

The contestant, Pringle, submits as his ground of contest (in which he is supported by his brother Benjamin), first, that the testator was mentally incompetent to make a will at the time the alleged codicil complained of was executed; second, that undue influence was used in procuring the execution and signature of Thomas Thornton to the said codicil complained of.

The issues thus raised were submitted to a jury and after a trial lasting four days there was a verdict and judgment against this second codicil, leaving the will and the first codicil in effect, of which James Taylor Thornton is here complaining.

There are several errors assigned, but in our view of the case it is only necessary to consider the third, namely, that "the court erred in refusing to set aside the verdict of the jury upon the ground that it is contrary to the evidence."

The principles governing this class of cases have been so frequently stated that it is unnecessary to undertake any extended review of the cases though the briefs carefully do so.

1. To sustain these issues the contestants rely upon the testimony of several witnesses, among them Mr. H. V. Glascock, who was the agent named in the last written contract between the testator and Pringle, and he expresses the opinion that he was mentally incapable but when his testimony is analyzed the facts stated hardly sustain his opinion.

[1] When a non-expert expresses such an opinion, it is settled that his evidence is of little value except so far as he testifies as to facts which indicate such incapacity. His chief reason appears to be that the testator left the provisions of this contract largely to him (Glascock). This does not make the impression upon us that it seems to have made upon him. It must be remembered that the testator had then left his home and wanted Glascock to look after his son Pringle as well as to look after his (the testator's) own interests as owner of the farm, so it was both wise and natural that he should defer to his prospective agent and leave the details of the contract largely to him, if satisfied with the substance of the agreement. It seems perfectly apparent that at this time the testator had formed the purpose of changing his home and staying for a time with his son Taylor, and this being true he desired Glascock's services. Glascock then understood that the testator was going to live on the farm, but the agreement itself, fairly construed, shows that he was mistaken. It reserves one room in the dwelling house for the testator's own use, and provides in the same clause that "the party of the first part is to furnish all farming tools and implements together with one horse, used and now on said farm, and the party of the second part (Pringle) agrees to board the party of the first part in consideration of the same whenever he may choose to live there and occupy the said room reserved above." So that Glascock evidently misunderstood or minimized the strained relations which at that time existed.

Construing Glascock's testimony as a whole, it is shown that the testator made a sensible contract under the circumstances; that one motive for making it was his distrust of his son Pringle's capacity; and as he was

going to be absent he wished Mr. Glascock to represent him.

This evidence of Glascock is sustained by Mr. A. O. Weedon, the reputable attorney who drew the contract, and he expresses the opinion that the testator's mental condition at the time was "so poor that I would not have drawn the contract with him had he not been reinforced by his agent, Mr. H. V. Glascock. His son Taylor was also with him." Then he says he got his information sometimes from the testator, sometimes from Taylor, but most of it from Mr. Glascock.

[2] It is shown that for many years it was the intention of the testator to give the property to Pringle for life. Possibly the strongest witness to support this contention, mental incapacity, is Rosa Thornton, the wife of Pringle; but tested by the same rule that all non-expert witnesses should give facts and not impressions, her testimony is quite insufficient. While she says he did not know what he was doing, and would ask the same thing over and over, and could not understand what was told him (he was quite deaf), she also testifies that in repeated conversations with him he told her everything that was in the will, and almost every word that was in it, and that at the same time she was receiving checks from the testator for money due her, and paying him for money due him. Among other facts, after identifying a check for $300.00 which the testator gave to his son Benjamin, to whom the will bequeathed $300.00, she was asked if she thought the testator then knew what he was doing, and she replied: "He said rather than let them wait until he was dead he would give it to them now." In other words, when carefully scrutinized, her testimony and all of the rest only shows that the testator was a very old man, infirm, willful and exacting of those whom he

considered his dependents, and that his failing eyesight and deafness made him more dependent and less capable.

[3, 4] On the other hand, the testimony of the subscribing witness to the codicil, Mr. McIntyre, is clear, full and complete. He shows that the testator not only knew the contents of the original will and the first codicil; that he knew of his property; and that he knew of his children; and that he fully understood what he was doing. This testimony, unless overthrown fully, meets every requirement of the law for it is well settled that the testimony of the subscribing witness at the time of the act is entitled to peculiar weight. The other subscribing witness was called in from the street, had never seen the testator before, paid little attention to the transaction, and his testimony, while it fails to support the testator's capacity, is negative.

Then there is the testimony of the two physicians, Dr. Maphis, who had attended the testator for many years before his removal to Prince William, had failed to observe anything which indicated mental incapacity, while the testimony of Dr. Wine, who attended the testator between October 1 and December 10, 1919, which period covers the date upon which the codicil was executed, and for a year thereafter, testifies that his mental condition was good; that he paid him for professional services sometimes in cash and sometimes by check. This physician is positive that he had sufficient intelligence to make a will; that he was not vacillating but absolutely firm and positive in his business transactions. He frequently prescribed for the testator during this period until he returned to Fauquier in December, 1920. There is no contradiction of this expert testimony, and the record further shows that during this period in which his incompetency is alleged,

his relations with his other two sons, Benjamin and William, who visited him were perfectly natural; that he from time to time gave them money; that while he did not personally write, he always signed his own checks, and at his death had a substantial bank balance of $5,000.00 in his favor. It is shown specifically that on the date the codicil was executed, December 1, 1919, he went to a retail store in Warrenton, selected and bought underclothing for himself amounting to something over $20.00, paid therefor with his check, and the merchant who was the salesman testifies that while he was quite deaf he had no trouble in making his purchases.

So that it is manifest to us that he had testamentary capacity at that time, and that unless the courts are to renounce altogether their duty to supervise verdicts it must be held that this testator was mentally competent.

[5, 7] 2. That upon the other issue, that of undue influence, the burden is upon the contestant, Pringle, goes without saying and as to this he has also failed. Undue influence, as has been said, is a species of fraud, and so must be proved by clear, cogent and convincing testimony. Influence is not undue which rests upon natural affection and desire to give property to those who are most considerate, attentive and useful to us. In this case the whole theory of undue influence is based upon the fact that the testator lived in the house with Taylor, and that their relations were intimate while Pringle's relations with him were strained. There is not a syllable of testimony to the effect that any effort was ever exerted to induce him to change his will. Nor is there any evidence that he ever parted with a single dollar while living except of his own volition. The truth is that because of changed conditions at his home, brought about by the marriage of

Pringle, he found that home unpleasant—and this is said without reflection upon Mrs. Pringle Thornton. She gives her point of view, and it is reasonable; but it is apparent under the circumstances that it was unwise. If she had shown more diplomacy and yielded more willingly to the views of the testator it is doubtful whether the last codicil would ever have been executed. That the testator's attitude toward Pringle had changed is shown in several ways—for instance, they had conducted the farm for many years without any definite contract, but after the marriage a contract was found necessary, and for the last year both a written contract and an intermediary, Mr. Glascock, were required; and when the term of that contract had ended, the testator served a written notice upon his son, Pringle, to vacate the property, so that he might return and occupy it himself with his son Taylor. All of this clearly shows a changed purpose. In view of the circumstances, there is nothing inhuman or unnatural about this change of purpose. The oldest son of Taylor Thornton was named for him, and in Taylor's four children flowed the blood of his loins. That he concluded to leave his property to his son Taylor as the best means of applying it to the benefit of those who bore his name is evident.

There are many other details for and against the contentions of these litigants, but nothing more significant, and nothing in our view which can change the result.

We have cited no cases. They are abundant to support these views. Among them are, *Jenkins* v. *Rhodes*, 106 Va. 569, 56 S. E. 332, 334, where it is said: "Before undue influence can be made the ground for setting aside a deed it must be sufficient to destroy free agency on the part of the grantor; it must amount to coercion —practically duress. Suggestion and advice, addressed

to the understanding and judgment, do not constitute undue influence, nor does solicitation, unless the party be so worn by the importunties that his will gives way. Earnest entreaty, importunity and persuasion may be employed, but if the influence is not irresistible it is not undue, and its existence is immaterial even though it is yielded to.  *Greer* v. *Greer,* 9 Gratt. (50 Va.) 330, 333; *Orr* v. *Pennington,* 93 Va. 268, 24 S. E. 928; *Hammond* v. *Welton,* 106 Mich. 244, 64 N. W. 25; *Hamilton* v. *Smith,* 57 Ia. 15, 10 N. W. 276, 42 Am. Rep. 39.   To set aside a deed for undue influence, it must be shown to the satisfaction of the court that the party had no free will, but stood in *vinculis.*   *Conley* v. *Nailor,* 118 U. S. 127, 30 L. Ed. 112, 6 Sup. Ct. 1001.''

To the same effect is *Wallen* v. *Wallen,* 107 Va. 131, 57 S. E. 596, a will case; *Howard* v. *Howard,* 112 Va. 566, 72 S. E. 133, is pertinent because it involves the will of a man 89 years of age; *Wohlford* v. *Wohlford,* 121 Va. 699, 93 S. E. 629, sustains a deed induced by a change of feeling on the part of a father to a son which resulted in a change of purpose on the part of the father as to the disposition of his property.

*Huff* v. *Welch,* 115 Va. 74, 78 S. E. 573, is strikingly like this case, both in its facts and the legal propositions involved.   The verdict of the jury against the will was set aside in this court.   The rules here stated are only repetitions of what is there said and it is unnecessary to make further citations.

To permit this verdict to stand would be to ignore long and well established doctrines, and to substitute the judgment of the jury for the will of the testator, and this without evidence to justify such a conclusion.

The precedents could be multiplied, but we think it unnecessary to say more than that in our opinion the court erred in refusing to set aside the verdict; that it

should have sustained this motion; and that this court will here enter judgment notwithstanding the verdict, holding that the codicil dated December 1, 1919, was duly executed, and should be admitted to probate as part of the last will and testament of Thomas Thornton, deceased.

*Reversed.*