# Staunton.

BENJAMIN FRANKLIN CULPEPPER v. ELIZABETH G. ROBIE,
ET ALS.

September 12, 1930.

Absent, Campbell and Holt, JJ.

The opinion states the case.

*Crumpler & Crumpler* and *John N. Sebrell*, for the appellant.

*James G. Martin, Tom E. Gilman* and *Charles B. Godwin, Jr.*, for the appellees.

HUDGINS, J., delivered the opinion of the court.

The following instructions were given by the trial court:

"(1) The court instructs the jury that the test of whether or not a testator had legal testamentary capacity relates to the time at which the will was executed, and if the jury shall believe from the evidence that Nathaniel D. Culpepper was mentally capable of making a will upon the date of its execution, then the same is valid so far as mental capacity is concerned, whatever may have been his condition mentally prior or after the time of executing said will.

"(2) The court instructs the jury that the evidence. of physicians on the question of mental capacity, especially those who attended the testator and were with him considerably during thé time it is alleged he was of unsound mind, is entitled to great weight.

"(5) The court instructs the jury that the testimony of credible witnesses present at the execution of the will is entitled to peculiar weight on the question of testamentary capacity and that this is especially true of attesting witnesses whose duty it is to ascertain and judge of the testator's mental capacity at the time.

"(6) The court instructs the jury that the testimony of a reputable attorney who receives the instructions for drafting the will, drafts it, reads it over and explains it to the testator, and is present at its execution, is entitled to consideration as to the mental capacity of the testator, *but has no special bearing upon undue influence.* (Italics supplied.)

"(8) The jury are instructed that neither sickness, old age, eccentricity, nor impaired intellect, nor all of them combined are sufficient, standing alone, to render invalid a will, and even if the jury believe from the evidence that any one or more or all of these conditions existed in the case of the testator, Nathaniel D. Culpepper, when he executed his will in question, and even though the jury shall believe from the evidence that the testator at the time of executing the said will was of advanced age or was infirm in health, and even though they may believe from the evidence that his intellect was impaired to some extent, nevertheless, if they shall further believe and find from the evidence that at the time of executing the said will the said Nathaniel D. Culpepper was capable of recollecting the property he was about to dispose of, the persons who were the objects of his bounty and the manner in which he wished his property distributed among them, and had an understanding of the nature of the business in which he was engaged, then the jury must find that he had mental capacity to make a valid disposition of his estate.

"(9) The court instructs the jury that they cannot measure the testator's capacity nor inquire into the wisdom and prudence of his disposition of the property if the jury believe from the evidence that he is legally *compos mentis*; be he wise or unwise, he is the disposer of his own property and his will stands as a reason for his action. He is under no legal obligation to will his property to his relations, and the justice or propriety of the will is not a question for the jury except that they may consider that matter as a circumstance bearing upon the testator's mental capacity or undue influence. If he is a capable testator he can will his property as he chooses.

"(12) The court instructs the jury that if they believe from the evidence that the writing purporting to be the last will and testament of Nathaniel D. Culpepper, deceased, was signed by the testator or acknowledged by him in the

presence of at least two competent witnesses present at the same time, and that such witnesses subscribed the will in the presence of the testator, then the will was properly executed.

"(13) The court instructs the jury that the mere fact that the testator was at times the victim of hallucinations or even insane delusions is not sufficient evidence of lack of testamentary capacity to avoid a will unless the will was the product of the said hallucinations or insane delusions, and if you believe that the testator at the time the will was executed had sufficient mind and memory to know the business he was then engaged in, the amount of his property and the objects of his bounty, then the testator had sufficient testamentary capacity to execute the will in question.

"(14) The court instructs the jury that while the burden of proof is upon those offering a will for probate, to show testamentary capacity on the part of the testator at the time the will was executed to the satisfaction of the jury, yet the court tells the jury that there is in all cases an existing presumption in favor of the testator's sanity and capacity, which is to be taken into consideration by the jury in determining the question of competency.

"(15) The court instructs the jury that undue influence, which is a species of fraud, must not be presumed but must be proven by satisfactory testimony; and the burden of such proof rests upon the contestants, Elizabeth G. Robie, and others. This instruction must be read in connection with instruction No. 7-A.

"(18) The court instructs the jury that while declarations of a testator not contemporaneously made with the execution of the will, are relevant evidence to show his mental condition or capacity, as well as his feelings or affections towards the natural beneficiaries of his bounty, yet they are not admissible to establish the substantive fact of undue influence.

"(24)   As to the question of mental incapacity alone, the opinion of lay witnesses is of little value except as they testify to facts and circumstances.

"(25)   The court instructs the jury that a will should not be set aside simply because the testator was influenced by natural affection and desire to give property to those most considerate and attentive to him.   In other words a will should not be set aside because the testator was influenced to make the will by others, unless such influence was undue.

"(1-a)   The court instructs the jury that the burden is upon the proponent of the will in this case, Benjamin F. Culpepper, to establish that the paper writing in question is the true last will and testament of Nathaniel D. Culpepper.

"(2-a)   The court instructs the jury that the nature and character of the will may be considered by the jury as a circumstance, along with all other facts and circumstances in the case, on the question of testamentary capacity of Nathaniel D. Culpepper and upon the question of undue influence upon him.

"(3-a)   The jury are further instructed that testamentary incapacity does not necessarily require that a person shall be actually insane.   Weakness of intellect, regardless of how it may arise, may render the testator incapable of making a valid will, provided such weakness really disqualifies him from knowing or appreciating the nature, effect or consequences of the acts he is engaged in.   In order to make him of sound and disposing mind and memory he must retain sufficient active memory to collect in his mind, without prompting, particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them.

"(4-a)   The court instructs the jury that direct proof is not necessary to overthrow the will, but any facts and circumstances are sufficient as evidence, provided that the jury believe from such facts and circumstances in evidence that the testator was incapable of making a testamentary disposition of his property at the time of the execution of the will or that he acted because of undue influence upon him.

"(5-a)   The court instructs the jury that the will cannot be sustained if the jury believe from the evidence that the testator, Nathaniel D. Culpepper, at the time of its execution, acted under undue influence and unless they believe from the evidence that he understood its contents, and was of sound and discerning mind and memory, so as to be capable of making a testamentary disposition of his property with sense and judgment in reference to the situation and amount of such property, and to the relative claims of different persons who are or might be the objects of his bounty.   If the jury believe from the evidence the testator was thus incapable of making a will or acted under undue influence, the verdict must be against the validity of the will, even though the jury may believe from the evidence that he was capable of understanding and conducting other transactions.

"(6-a)   The court instructs the jury that undue influence is any means employed upon the testator by which, under the circumstances and conditions by which the testator was surrounded, he could not well resist, and which controlled his volition, and induced him to do what otherwise he would not have done.

"(7-a)   The court instructs the jury that if they believe from the evidence that at the time the will in question was made the testator, Nathaniel D. Culpepper, was an old man and in the house of Benjamin Franklin Culpepper, and that Benjamin Franklin Culpepper stood in relation

of confidence or dependence towards the testator, and that the will left all the property to Benjamin Franklin Culpepper, and differs from the previously expressed intention of the testator, it raises a presumption of fraud and undue influence, which should be overcome by satisfactory evidence before the will should be allowed to stand."

Instructions 6, 15 and 25 were offered in the following forms, but amended by the court and given in the forms set forth hereinbefore (the italics show changes made by the court):

"(6) The court instructs the jury that the testimony of a reputable attorney who receives the instructions for drafting the will, drafts it, reads it over and explains it to the testator, and is present at its execution, is entitled to *very great* consideration as to the mental capacity of the testator. (Italics supplied.)

"(15) The court instructs the jury that undue influence, which is a species of fraud, must not be presumed but must be proven by *clear, cogent* and *convincing* testimony, and the burden of such proof rests upon the contestants, Elizabeth G. Robie, and others. (Italics supplied.)

"(25) The court instructs the jury that a will should not be set aside simply because the testator was influenced by natural affection and desire to give property to those most considerate and attentive to him. In other words a will should not be set aside because the testator was influenced to make the will by others, unless such influence was undue. *Suggestions and advice, addressed to the understanding and judgment, do not constitute undue influence, nor does solicitation, unless the party be so worn by importunity that his will gives way. Earnest entreaty, importunity, and persuasion may be employed and yielded to, and the influence thereof is not undue, unless it was irresistible.*"

The following instructions, requested by the contestee, were refused.

"(19)   The court instructs the jury that before undue influence can be made a ground for setting aside the will, it must be sufficient to destroy free agency on the part of the person executing the will.   It must amount to coercion or duress.

"(22)   The court instructs the jury that the influence resulting from attachment or love or mere desire of gratifying the wishes of another, if free agency is not impaired, does not affect the will.   The influence must amount to force or coercion destroying free agency.   It must not be the influence of affection or attachment.   It must not be mere desire of gratifying the wishes of another, as that would be strong ground to support the will.   Further, there must be proof that it was obtained by this coercion, by importunity that could not be resisted; that it was done merely for the sake of peace so that the motive was tantamount to force and fear.

"(23)   The court instructs the jury that the influence resulting from attachment or love or mere desire of gratifying the wishes of another, if free agency is not impaired, does not affect the will.   The influence must amount to force or coercion destroying free agency.   It must not be the influence of affection or attachment.   It must not be mere desire of gratifying the wishes of another, as that would be strong ground to support the will."

The issue of *devisavit vel non,* was decided by a jury in the Circuit Court of Nansemond county in behalf of the contestants and judgment entered on the verdict by the trial court.   The errors assigned by the contestee may be stated thus:

(1)   The verdict of the jury and the judgment of the court thereon were contrary to the law and the evidence and without evidence to support them.   (2)   Errors in the admission of certain evidence.   (3)   Errors in granting and refusing certain instructions.   (4)   Misconduct of the jury.

In view of the verdict of the jury, it is necessary to consider all material conflict in the testimony as settled by the verdict in favor of the contestants. Under these circumstances, the facts may be stated thus:

Nathaniel D. Culpepper, an aged and infirm bachelor, hereinafter referred to as the testator, lived with his sister on a farm at Gilmerton, just outside of Portsmouth, which they owned jointly. In 1920 they sold the farm for $50,000.00, net, but continued to live on it as tenants. The sister died in August, 1927, leaving her brother her sole distributee.

The testator was uneducated and inexperienced in financial affairs and in business matters acted largely on the advice of Charles Old, chairman of the board of supervisors of Norfolk county, and R. S. Marshall, cashier of the Bank of Tidewater, at Portsmouth; he also frequently consulted Norman Cassell, a lawyer of Portsmouth. On the advice of these men, he invested $50,000.00 in United States Liberty bonds, which he kept in a safety deposit box in the Bank of Tidewater.

The testator's nearest relatives were a large number of first and second cousins. Those with whom he seemed on most friendly terms were Mrs. Robie and Mrs. Mahew, of Portsmouth, Mrs. Nettie Martin, of Norfolk, and Mrs. Munden, of Gilmerton. These four visited him frequently, Mrs. Munden almost daily.

The testator's eyesight was bad, he was deaf, and for years had suffered from an incurable disease of the leg; he had pneumonia in 1927 and again in 1928. In the spring of 1928 he was either paralyzed or had a sun stroke, which affected his speech and from which he never recovered sufficiently to be able to walk without assistance.

Benjamin Franklin Culpepper, the contestee, was a second cousin who lived at Magnolia, about three miles from Suffolk. He was more than forty years old, had never

been intimate with the testator, and had not seen him for more than thirty years until the occasion of the incidents hereinafter related. His wife, Mary E. Culpepper, was not related to the testator and had never seen him until about a year before his death. Some time in June, 1927, Mary E. Culpepper suggested to her husband that they visit the testator, and they drove to his farm. Later, the contestee saw in a newspaper a notice of the death of the testator's sister, and he, his wife and daughter attended her funeral.

In February, 1928, the testator was taken by John Rutter to see Tom E. Gilman, an attorney and judge of the Juvenile and Domestic Relations Court of Norfolk county, with offices in Portsmouth. The testator instructed Mr. Gilman to draft his will. In the discussion between the testator and the attorney over the provisions of the will, it developed that the testator did not know the names, or the initials, of some of those whom he desired to make the objects of his bounty, among these being either B. F. Culpepper or his daughter. In order to get this information, about February 18th the testator was taken by Haywood Munden to the home of B. F. Culpepper, at Magnolia, and stated to B. F. Culpepper and his wife that he wished to ascertain the name of their daughter for the purpose of leaving her something in his will. B. F. Culpepper told the testator he preferred to have the legacy given to himself instead of his daughter (this is strenuously denied by both B. F. Culpepper and his wife). At any rate, the testator returned to the office of Tom E. Gilman and by a will then prepared Benjamin Franklin Culpepper was given $4,000.00. By the same will $3,000.00 was bequeathed to Mrs. Munden, $2,000.00 to Dr. Fields, and twenty-one other specific bequests to as many persons, varying from $10.00 to $10,000.00. The largest bequest of $10,000.00 was given to James H. Garnes, who had lived with the testator for more than twenty-five years. The remainder of the estate, which at

that time amounted to some $24,000.00, was bequeathed according to the statute of descent and distribution.*

Sometime thereafter, Dr. Fields called upon the testator and after a private conference, John Rutter, who had charge of the above will, was instructed to deliver the same to the testator, which he did in the presence of Dr. Fields. Dr. Fields then took the testator in his automobile to Portsmouth. On arriving at the Bank of Tidewater, Dr. Fields informed R. S. Marshall, cashier of the bank, that N. D. Culpepper desired to make him, Marshall, a present of $2,000.00 in Liberty bonds. Mr. Marshall doubted the propriety of his acceptance of such a gift, as he was cashier of the bank and one of the business advisers of the testator.

*I, Nathaniel D. Culpepper, of Norfolk county, Virginia, being of sound and disposing mind, do hereby make, publish and declare this to be my last will and testament, hereby revoking all other wills by me at any time made;
1. I direct that all my just debts be paid.
2. I give and bequeath to the following, the amounts named:

| | |
|---|---:|
| To James H. Garnes, Gilmerton | $ 9,000.00 |
| To Benjamin Franklin Culpepper, Magnolia | 4,000.00 |
| To Haywood Munden, Gilmerton | 3,000.00 |
| To Richard Marshall, Portsmouth | 2,000.00 |
| To Dr. A. Fields, Norfolk | 2,000.00 |
| To Norman Cassell, Portsmouth | 1,000.00 |
| To John R. Rutter, Gilmerton | 1,200.00 |
| To Miss Kate Cherry, Gilmerton | 1,000.00 |
| To Mrs. Bertie Spence, Hickory | 500.00 |
| To Gilbert Sykes, Gilmerton | 500.00 |
| To Miss Lois Ellis, Norfolk | 500.00 |
| To Leonard Owens, Deep Creek boulevard | 500.00 |
| To Miss Willie May Garnes | 300.00 |
| To Mrs. Lizzie Robie, Westhaven | 300.00 |
| To Mrs. Margaret Gaskins Mayhew, Westhaven | 300.00 |
| To Isaac Owens (col.), Gilmerton | 200.00 |
| To Lizzie Harrell (col.), Gilmerton | 150.00 |
| To Henry Whitaker (col.), Gilmerton | 100.00 |
| To Dave Sharrett, Baltimore | 100.00 |
| To Mrs. Nettie Martin, Norfolk | 100.00 |
| | $27,750.00 |
| To Webster Garnes | 10.00 |
| To Mrs. Pauline Clark | 10.00 |
| To Mrs. Georgiana Vaughan | 10.00 |
| | $27,780.00 |

After some discussion between Mr. Marshall, Dr. Fields and N. D. Culpepper it developed that Dr. Fields was to receive $3,500.00 in bonds. Mr. Norman Cassell was consulted and his advice obtained, resulting in N. D. Culpepper executing a deed of gift to both R. S. Marshall and Dr. Fields for the respective amounts named.

On the same day, April 3, 1928, Norman Cassell prepared and N. D. Culpepper executed another will, omitting therefrom the names of Dr. Fields and R. S. Marshall, and adding a bequest of $5,000.00 to the Portsmouth Orphan Asylum, naming Dr. Fields as executor instead of Mr. Gilman, and making other comparatively small changes from the February will.†

3. All the rest and residue of my estate not herein disposed of, of every description, will pass to those persons who would be entitled to receive the same according to the present law of Virginia.

4. I hereby nominate and appoint Tom E. Gilman, executor of this my last will and testament, with full power and authority to execute the same according to its true and intended meaning.

Given under my hand and seal this the ————— day of February, 1928.

————— (Seal)

The above signature of the testator was made and the foregoing will was acknowledged to be his last will and testament by the said testator, in the presence of us, three competent witnesses, present at the same time; and we, the said witnesses, do hereunto subscribe the said will on the date last above written, in the presence of the said testator, and of each other, at the request of the said testator, who was then of sound mind and over the age of twenty-one years.

—————
—————

†In the name of God, Amen. I, Nathaniel D. Culpepper, of the county of Norfolk, in the State of Virginia, do make this my last will and testament, hereby revoking all former wills by me at any time made.

1. First, I desire that my body may be decently buried, without needless expense, in a manner corresponding to my estate and situation in life.

2. Secondly, I direct that all my just debts may be paid as soon after my decease as conveniently may be.

3. Thirdly, I give and bequeath to the following named persons, the respective sums of money set opposite to their names:

| | |
|---|---|
| To James H. Garnes, Gilmerton, Norfolk county, Virginia....... | $10,000.00 |
| To Benjamin Franklin Culpepper, Magnolia, Nansemond county, Virginia............................................ | 4,000.00 |
| To Haywood Munden, Gilmerton, Norfolk county, Virginia..... | 3,000.00 |
| To Portsmouth Orphan Asylum, Portsmouth, Virginia.......... | 5,000.00 |
| To Norman Cassell, Portsmouth, Virginia.................... | 1,000.00 |
| To John R. Rutter, Gilmerton, Norfolk county, Virginia........ | 700.00 |
| To Miss Kate Cherry, Gilmerton, Norfolk county, Virginia...... | 1,000.00 |

After the execution of this will and immediately on leaving Mr. Cassell's office, when the testator and Dr. Fields were alone together, Dr. Fields had the testator sign a note agreeing to pay Dr. Fields $3,000.00 as an additional gift. This fact was kept secret and was not disclosed until after the death of the testator. Dr. Fields' explanation of this transaction was that the testator wanted to give him additional Liberty bonds at that time, but could not do so because the bonds were not in Portsmouth but in Washington. Mr. Marshall testified that the bonds were in the safety deposit box in his bank, and $5,500.00 in bonds had just been obtained therefrom.

To Mrs. Willie May Spence, formerly Willie May Garnes, Hickory,
    Norfolk county, Virginia................................ $500.00
To Gilbert Sykes, Gilmerton, Norfolk county, Virginia.......... 500.00
To Miss Lois Ellis, Norfolk, Virginia.......................... 500.00
To Leonard Owens, Deep Creek boulevard, Norfolk county,
    Virginia............................................... 500.00
To Mrs. Lizzie Robie, Westhaven, Norfolk county, Virginia..... 300.00
To Mrs. Margaret Gaskins, Mayhew, Westhaven, Norfolk county,
    Virginia............................................... 300.00
                              · [Signed]    Nathaniel D. Culpepper
Witnesses:
    [Signed]    Etheleen Mitchell
    [Signed]    W. H. W. Cassell
To Isaac Owens (colored), Gilmerton, Norfolk, Virginia.............$200.00
To Lizzie Harrell (colored), Gilmerton, Norfolk county, Virginia..... 150.00
To Henry Whitaker (colored), Gilmerton, Norfolk county, Virginia.. 100.00
To Dave Sharrett, Baltimore, Maryland......................... 100.00
To Mrs. Nettie Martin, Norfolk, Virginia....................... 100.00
To Webster Garnes, Norfolk county, Virginia.................... 10.00
To Mrs. Pauline Clark, Gilmerton, Norfolk county, Virginia........ 10.00
    4.    Fourthly, All the rest and residue of my estate, real, personal and mixed, wherever situated, I give and devise to those persons, who at my death, would be my heirs according to the law of the State of Virginia at the time of my death.
    5.    Fifthly, I nominate and appoint Doctor Alpheus Fields, of the city of Norfolk, Virginia, to be the executor of this my last will and testament.
    Witness my hand, which I have set to this my will, written upon two (2) sheets of paper, signing every sheet thereof, this third day of April, A. D., nineteen hundred and twenty-eight.
                              [Signed]    Nathaniel D. Culpepper
    Signed and published by Nathaniel D. Culpepper, as and for his last will, in the presence of us, who in his presence, at his request, and in the presence of each other, have hereunto subscribed our names as witnesses.
                              [Signed]    Etheleen Mitchell
                              [Signed]    W. H. W. Cassell.

There is testimony of witnesses showing that the testator was senile, childish and foolish. He carried a picture of a bathing girl in his pocket and at times would take it out and kiss it. He was sometimes vulgar in his talk, and would clap his hands and laugh, without apparent cause. He had hallucinations and forms of delusion.

After the first trip that the testator made to B. F. Culpepper's home the visits between them became more and more frequent, the length increasing from an hour or two until by June the testator would stay at the home of B. F. Culpepper several days at a time. Sometime in the winter or spring of 1928 B. F. Culpepper applied to the testator for a loan of $5,000.00. Mr. Cassell advised the testator not to make the loan without adequate security, and no loan was made on this occasion. In May B. F. Culpepper again applied for a loan of $5,000.00, and accompanied the testator to the Bank of Tidewater, where Mr. Marshall advised the testator not to make the loan and practically refused to permit the testator to get the bonds out of the safety deposit box.

On May 23d the testator had blood pressure as high as 210. Dr. Redwood qualified as an expert and testified that in all his experience he had never known but one man who had blood pressure that high who was competent to transact business; that high blood pressure is caused by diseased and hardened arteries and in a man of such advanced age could not be permanently reduced.

On May 31st, B. F. Culpepper and wife drove the testator to see Charles Old, to whom B. F. Culpepper stated that he didn't see why Mr. Marshall wouldn't let the testator get his bonds out of the safety deposit box. Mr. Old advised against disturbing the testator's investment, but upon the parties' insistence, went with the testator, B. F. Culpepper and his wife to the Bank of Tidewater and there, together with Mr. Marshall, delivered $5,000.00 in Liberty

bonds to the testator. B. F. Culpepper took the testator to Suffolk, had the $5,000.00 in Liberty bonds converted into cash, and the money was lent to B. F. Culpepper, who executed a note therefor and delivered it to the testator. On June 11th this note was torn up by the testator, in the presence of B. F. Culpepper and his family, and thus the $5,000.00 loan became a gift, according to the testimony of B. F. Culpepper and several members of his family.

On the same day, June 11th, B. F. Culpepper took the testator to the Bank of Tidewater and all the testator's bonds, amounting to more than $40,000.00, were carried by them to a bank in Suffolk with which B. F. Culpepper transacted business.

On June 17th the testator became very ill at his home in Gilmerton and was attended by two doctors and various friends and relatives, including B. F. Culpepper and his wife. In this illness, on that afternoon, the testator had raving spells and imagined he saw horses on the ceiling and around the room. In some of his quiet moments he stated that he had left Mrs. Munden, Mrs. Mahew and Mrs. Robie money by his will, and was talking a good deal about his financial matters. Some of the witnesses testified that on this day B. F. Culpepper remarked to his wife, in a low tone of voice: "We had better get him away from here early in the morning, he is talking too much." Both B. F. Culpepper and his wife denied this emphatically. On the morning of June 18th, B. F. Culpepper took the testator to his home near Suffolk, where, with perhaps one exception, he remained until his death on July 5th.

B. F. Culpepper went to Suffolk on June 21st and requested Mr. Jones, cashier of a bank in Suffolk, to go to his home in Magnolia. There Mr. Jones was instructed by the testator to convert all of his Liberty bonds, amounting to more than $40,000.00, into cash. Mr. Jones was unwilling to undertake this business for the testator until

he had obtained a doctor's certificate as to his sanity. The testator's investments had been in Liberty bonds from 1920 to June, 1928, without change. No reason or suggestion was given for the change at this time.

On June 22d, Mary E. Culpepper wrote a check to her own order for $20,000.00 and one to James H. Garnes for $10,000.00, which the testator signed. On the next day, June 23d, B. F. Culpepper went to Suffolk and informed Mr. Hugh L. Holland, an attorney, that the testator desired to see him. Mr. Holland immediately went to the home of B. F. Culpepper, saw the testator, and, after a private conference, returned to Suffolk and prepared the will (which is the subject of this controversy), and notified two of the subscribing witnesses, Dr. O. R. Yates and E. E. Jones, to meet him at B. F. Culpepper's home that afternoon. W. S. Powell, a third witness, was asked by B. F. Culpepper to be present at the execution of the will. In the afternoon of that day, June 23d, in the presence of the above parties, that is, the three subscribing witnesses and Mr. Holland, the will was read to the testator, who expressed his approval of its contents and signed the same in the presence of the three witnesses, who likewise signed their names thereto. Under the terms of this will B. F. Culpepper was made executor and sole beneficiary.

Immediately after the will was executed Mr. Holland sent for, or called, Mrs. Mary E. Culpepper and asked her for two checks. These she obtained from the bureau in the room occupied by the testator and where the above-named parties then were. The testator gave the $20,000.00 check to Mrs. Culpepper and said he wanted her to have it and informed those present, or rather stated where they could hear, that he desired James H. Garnes to have the other check, but he would have to come and get it.

James H. Garnes, the testator and B. F. Culpepper went to the American Bank and Trust Company in Suffolk on

June 28th, and there the check for $10,000.00 was delivered to James H. Garnes, the testator remarking that "he had brought Mr. Garnes to the bank to get him to deposit the money there to his credit."

On July 5th, N. D. Culpepper died. The will of June 23d was duly offered for probate, and this contest started.*

■ The jury were properly instructed on the weight to be given the evidence of the subscribing witnesses, all of whom testified that in their opinion the testator was normal and knew what he was doing at the time of the execution of the will. The evidence of the attending physician, who was also a subscribing witness, was clear and positive that in his opinion the testator's mind was normal, but this physician had only been attending the testator at irregular periods since May 23d. The attorney who prepared the will, was present at its execution and testified in detail, was also of opinion that the testator's mind was all right, but he had never seen the testator before. The testimony

---

*I, Nathaniel D. Culpepper, residing at Magnolia, in Nansemond county, Virginia, being of sound mind and disposing memory, but realizing the uncertainty of life, do make and publish this my last will and testament.

1.   First, I hereby revoke any and all former wills made by me at any *t*ime.

2.   Secondly, I hereby give, devise and bequeath unto my cousin, B enjamin Franklin Culpepper, of Magnolia, Nansemond county, Virginia, all of my money and property, real, personal and mixed, in whatever form and wherever located, in fee simple and absolutely.

3.   Thirdly, I desire and direct that said Benjamin Franklin Culpepper shall first pay all of my just debts including funeral expenses.

4.   Fourthly, I hereby appoint said Benjamin Franklin Culpepper as my Executor, under this my last will and testament, and respectfully request that he be allowed to qualify as such without security.

Witness my hand and seal to this my last will and testament, consisting of one sheet of paper, this twenty-third day of June, 1928.

Nathaniel D. Culpepper    (Seal.)

Nathaniel D. Culpepper

Signed, executed and published by Nathaniel D. Culpepper, as and for his last will, in the presence of us, who in his presence, at his request, and in the presence of each other, have hereunto subscribed our names as witnesses.

O. R. Yates

W. S. Powell

E. E. Jones

Virginia:

In the Clerk's Office of the Circuit Court of Nansemond county the 10th day of July, 1928.

of attesting witnesses to documents is entitled to "great weight," or as the courts sometimes express it "peculiar weight." *Price* v. *Barham*, 147 Va. 478, 137 S. E. 511. *Thornton* v. *Thornton*, 141 Va. 232, 126 S. E. 69; *Forehand* v. *Sawyer*, 147 Va. 106, 136 S. E. 683, 688. This "great weight" certainly should be given to the evidence of subscribing witnesses as to the execution of the instrument. Even to this act, however, such evidence is not conclusive. Page on Wills, section 664; *Jenkins* v. *Trice*, 152 Va. 411, at page 426, 147 S. E. 251.

The record is voluminous, sixty-five witnesses, including five doctors and three lawyers, were examined. Witnesses on both sides, who had equal opportunity to observe the condition of the testator's mind, disagreed in their opinions and the facts on which their opinions were based.

■ Considering all the circumstances above and those hereinafter related, there was sufficient evidence on which to submit the issue of testamentary capacity to the jury. The subject of undue influence will be discussed under the third assignment of error.

■ The second assignment of error is that the trial court improperly admitted evidence showing some of the contestants were members of certain fraternal orders.

Under Rule 22 this assignment cannot be considered. It may be said, however, that this evidence was offered after the proponent of the will had proven that two of the contestants belonged to a certain religious congregation. Under such circumstances there was no error in admitting this evidence. Injection of religious prejudice into a case has no place in a court room.

The third assignment of error deals with the instructions. The court amended instruction 5 by striking out the words "very great" and adding "but has no special bearing upon undue influence." *Forehand* v. *Sawyer, supra*, is relied on for the use of the words "very great." Judge Burks in his

opinion said: "The testimony, however, of a reputable attorney who receives the instructions for drafting the will, drafts it, reads it over and explains to it the testator, and is present at its execution is entitled to very great consideration as to the mental capacity of the testator. This is especially true in the absence of any suggestion of fraud, lack of memory or uncertainty as to what transpired, and when not in conflict with the testimony of the subscribing witnesses."

The attorney testifying in the instant case was an active participant in the trial below, and had made no charge for his service in preparing the will. He was not a personal friend of the testator, but a stranger until he was called in to prepare the will on June 23d. Under such circumstances the testimony of an attorney cannot be considered disinterested. Such conduct may not be in violation of the canon of ethics of the profession, but it certainly should not be encouraged. When an attorney engaged in a case becomes a witness to other than formal matters, his testimony should not as a matter of law be entitled to any greater weight than that of a lay witness.

The object of this instruction was to inform the jury that the evidence of a reliable attorney who prepared the will and explained it to the testator and was present at its execution was entitled to great weight, but such an instruction is not proper on the subject of undue influence. Evidently the court had this fact in mind when it added to the instruction the words "but has no special bearing upon undue influence." The contestee was entitled to have the jury consider this evidence on that question, but it was not entitled to have this particular evidence singled out and the jury told what weight to give it. Hence the addition was not appropriate to the legal principle contained in the instruction.

Instructions Nos. 2 and 5 told the jury what weight should be given the testimony of physicians and witnesses

to the factum, and in view of these and other instructions given, this amendment made by the court to this instruction was harmless error.

■ The trial court correctly refused a peremptory instruction taking away from the jury the question of undue influence. Thereafter the contestee offered successively instructions 19, 22, 23 and 25. The court refused the first three of these and amended instruction 25 by striking out the last two sentences.

■ The theory which underlies the doctrine of undue influence is that it is a species of fraud and, like all allegations of fraud, the burden is on the party who alleges undue influence to prove it by a preponderance of evidence, and before undue influence can be made a ground to set aside or vitiate an act it must be sufficient to destroy free agency, and any suggestion, advice, or even importunity which falls short of destroying free agency is not undue influence. Any means which induces a testator to execute an instrument which, although his in outward form, is in reality not his will but the will of another person is undue influence. (Page on Wills, sections 158 and 713.) Undue influence is essentially a question of fact and from its nature is frequently employed surreptitiously. It is shown chiefly by results, and hence the evidence to establish undue influence is usually circumstantial. Each fact by itself may be insufficient, although the facts when taken together may justify, and even require, such a finding. No abstract standard of undue influence can be set up. The question of what is undue influence such as to overcome the will or control the judgment of the testator depends upon the facts and circumstances of each particular case. There are numerous Virginia decisions so holding; we cite only a few. *Jenkins* v. *Trice*, 152 Va. 411, 147 S. E. 251; *Green* v. *Green*, 150 Va. 452, 143 S. E. 683; *Price* v. *Barham*, 147 Va. 478, 137 S. E. 511; *Forehand* v. *Sawyer*, 147 Va. 105, 136 S. E.

683; *Thornton* v. *Thornton*, 141 Va. 232, 126 S. E. 69; *Lester* v. *Simpkins*, 117 Va. 55, 83 S. E. 1062; *Chappell* v. *Trent*, 90 Va. 849, 19 S. E. 314; *Simmerman* v. *Songer*, 29 Gratt. (70 Va.) 9; *Parramore* v. *Taylor*, 11 Gratt. (52 Va.) 220; *Greer* v. *Greer*, 9 Gratt. (50 Va.) 330.

██ Instructions Nos. 9, 15, 18 and 25, requested by the contestee, and 6-a and 7-a requested by the contestants and given by the court, substantially instructed the jury on the legal principle of undue influence involved in this case. While it is true that instructions Nos. 19, 22, 23 and 25, without the amendment, requested by the contestee and refused by the court, are couched in language taken from the Virginia decisions, yet inasmuch as the instructions given substantially cover the issues and the evidence, the refusal of the trial court to give any of these latter instructions is not reversible error.

· ██ Before we leave this subject it is advisable to discuss instruction No. 7-a in detail, which for convenience is here set out in full.

"The court instructs the jury that if they believe from the evidence that at the time the will in question was made the testator, Nathaniel D. Culpepper, was an old man in the house of Benjamin Franklin Culpepper, and that Benjamin Franklin Culpepper stood in relation of confidence or dependence towards the testator, and that the will left all the property to Benjamin Franklin Culpepper, and differs from the previously expressed intention of the testator, it raises a presumption of fraud and undue influence, which should be overcome by satisfactory evidence before the will should be allowed to stand."

The cases of *Hartman* v. *Strickler*, 82 Va. 225, and *Whitelaw* v. *Sims*, 90 Va. 588, 19 S. E. 113, support the instruction. The language in the opinion of *Hartman* v. *Strickler*, is as follows: "Where a will executed by an old man differs from his previously expressed intentions, and is made in

favor of those who stand in relations of confidence or dependence towards him, it raises a violent presumption of fraud and undue influence, which should be overcome by satisfactory testimony."

The facts and circumstances in that case clearly raise a presumption of undue influence. It was shown that the testator had only two children, a son and a daughter, he lived with his son, but was devoted to his daughter; he had repeatedly stated that he did not intend to make a will, thus each child would under the statute of descent and distribution share equally in the division of his property. The son ruled his father with a "rod of iron"; he attempted to, and frequently did, prevent communication between his sister and his father. Just a few weeks before the testator's death he executed a will leaving practically his entire estate to his son.

In *Whitelaw* v. *Sims, supra,* the facts are not stated in the opinion of the court. The opinion simply quotes with approval the above language taken from the *Hartman Case* and because of the refusal of the trial court to so instruct the jury, with some other error, the case was reversed.

The language quoted from *Hartman* v. *Strickler* is too broad and sweeping in its scope and places too great a burden on children devoted to their parents who may, and frequently do, take the care and responsibility of looking after them in their declining years. Under the terms used only three things are necessary to raise a presumption of fraud. (1) The testator must be old. (2) He must have previously expressed an intention to otherwise dispose of his property. (3) The beneficiary must stand in a relationship of confidence or dependence to the testator. A more accurate statement would be that these are circumstances from which undue influence may be inferred, but are not alone sufficient to establish fraud, certainly not as between parent and child or husband and wife. See an

interesting discussion in Page on Wills, sections 716 to 727, 28 R. C. L., sections 98 to 104.

The evidence discloses that the intimacy between the testator and B. F. Culpepper was of very recent origin and did not arise by reason of long friendship or close blood ties; that within three months, or less, of the testator's death he had repeatedly expressed an intention of disposing of his property to his relatives and to those with whom he had long been associated. He was weak in mind and body. For some reason, not explained, within less than one month of his death practically his entire estate was transferred from the bank with which he had transacted his business for years to one of the banks with which B. F. Culpepper transacted his business, and within three days after the testator is moved into the home of B. F. Culpepper he converts his bonds into cash. Large gifts, totalling more than five-ninths of his estate, are made to B. F. Culpepper and his family, the greater part within five days from the time he became a member of B. F. Culpepper's household. B. F. Culpepper is given authority to enter the testator's safety deposit box at pleasure. The time of the execution of the will is just after the testator has had a severe attack of sickness and has been removed from contact with his friends, neighbors and relatives, among whom he had lived for years, to the home of the beneficiary. This evidence raises a strong inference of undue influence which must be satisfactorily explained by the proponent in order for the will to stand. B. F. Culpepper offers the following explanation for the testator's making his home with him.

"Q. Had you influenced him to decide to make his home in your house?

"A. No, sir. I just told him if he wanted to make his home with me he was perfectly welcome, *as all other old men.*

"Q. You would take care of *any* old man?

"A. *Yes.*

"Q. How about old *ladies?*

"A. I suppose *they would be welcome, too."* (Italics supplied.) Such statements need no comment.

The explanation offered by B. F. Culpepper for the $5,000.00 gift of the testator to him was that he had given Mr. Marshall $2,000.00, Dr. Fields $3,500.00, and he didn't see why he couldn't make him a gift. Without going into further details of the contestee's explanation of his association and transactions with the testator, suffice it to say that there is sufficient evidence to sustain the verdict of the jury. Under these circumstances, it was no error for the court to have given instruction No. 7-a.

██ Further objection is made to the action of the court in substituting the word "satisfactory" for the words "clear, cogent and convincing" in instruction No. 15. The courts in speaking of the kind of evidence necessary to establish fraud usually use the adjectives "clear, cogent and convincing." The court in this case, in order to be consistent, used the word "satisfactory" in the instructions, that is, in No. 15, requested by the contestee, and in No. 7-a, requested by the contestants. The jury could not have been misled thereby.

██ ██ The next, and last, assignment of error is the improper conduct of the jury. It seems that after the jury had been out for sometime they came back into the court room and the court told them, in substance, that if it was impossible for them to agree on a verdict that night, which was Saturday, he would order them to return on Monday; that the case had taken some time in its trial and he hoped that by further deliberation they might reach an agreement. The learned trial judge then gave the jury a very fair and impartial statement of some of the reasons why they should get together. Thereupon the foreman requested that further time be given them then. A short time thereafter the jury agreed on the verdict here in question.

It appears that some weeks after the verdict was rendered B. F. Culpepper's son, two attorneys and a notary visited four of the jurors in an effort to ascertain what took place in the jury room. No written statements were obtained and on the day the action for a new trial was heard the foreman of the jury was introduced as a witness to impeach the verdict. The substance of his testimony was that the jury at first stood four to three, that after the interview with the judge, he, with several others, changed his vote, and that he had stated to his fellow jurors before the ballot was taken that he would vote with the majority. His explanation of this change is, in substance, that he thought the evidence would justify a verdict for either the contestee or the contestants.

It has long been settled in Virginia that the affidavits or the testimony of jurors to impeach their own verdicts are to be received with great caution and only in exceptional cases, and in order to prevent a failure of justice. *Litz* v. *Harman*, 151 Va. 363, 144 S. E. 477; *Bryan* v. *Commonwealth*, 131 Va. 709, 109 S. E. 477; *Washington Luna Park* v. *Goodrich*, 110 Va. 692, 66 S. E. 977; *Manor* v. *Hindman*, 123 Va. 767, 97 S. E. 332; *Bull's Case*, 14 Gratt. (55 Va.) 613. The reason for the rule is that otherwise there would be held out to unsuccessful litigants and their friends the strongest temptation to tamper with jurors after their decision and might be productive of great evil. The record discloses nothing which takes the case out of the established rule, but indeed emphasizes the necessity for adherence thereto.

We find no reversible error in the record and the judgment will be affirmed.

*Affirmed.*

Epes, J., dissenting:

I regret that I am not able to concur in the view expressed in the opinion of the court, that there is no prejudicial error in this record.

The evidence in this case shows that the attorney who drafted the will in issue here was in a position to see, hear and know many things which had a most material bearing upon the question of undue influence. Instruction No. 6, tendered by the appellant, deals with the weight to be given the testimony of the attorney who drafted the will; and by adding to this instruction the words, "but has no special bearing upon undue influence," the court, in effect, told the jury that the testimony of the attorney who drafted this will had no special bearing upon undue influence, which, under the facts of this case, was erroneous.

Instruction No. 7-a, though it follows closely the language of some opinions of the Supreme Court of Appeals of Virginia and of other courts, does not, in my opinion, state a correct rule of law. The facts therein recited do not, as a matter of law, raise a presumption of fraud and undue influence. They are merely facts which, along with other facts, may warrant a jury in inferring that the beneficiary has been guilty of fraud and undue influence; and it was error to have told the jury that the facts recited in instruction No. 7-a raised a presumption of fraud and undue influence. The majority opinion appears to recognize that this is true, but apparently takes the view that it is harmless error.

In view of the fact that the evidence is very conflicting on the question of undue influence; that the jury, after lengthy deliberation, advised the court that it was impossible for them to agree upon a verdict that night, thereby implying that they were seriously divided upon the questions at issue, and that they only reached an agreement finding against the will after being urged by the court to get together, I am not able to say that the two errors herein mentioned were harmless.