# Richmond.

## PRICE'S EXECUTOR V. BARHAM, ETC.

March 17, 1927.

1. CONTRACTS—*Mental Capacity—Evidence—Evidence as to Condition Before and After the Factum.*—While evidence of mental incapacity shortly before or after the principal event is admissible because it throws light on the probable mental condition at the time of such event, still the crucial time at which capacity must exist is the time of the *factum*—the time at which the act complained of was done. If mental capacity at that time is satisfactorily shown, it is immaterial what the capacity was before or after that time.

2. CONTRACTS—*Mental Capacity—Evidence—Weight Attached to Testimony of Different Classes of Witnesses—Attesting Witnesses—Physicians.*—In the determination of the question of mental capacity to make a contract, the same weight is not attached to the testimony of all classes of witnesses. The testimony of attesting witnesses to documents and of others present at their execution is entitled to peculiar weight. Physicians also, it is held, occupy a high grade on the question of mental capacity, and this is especially true of a family physician.

3. CONTRACTS—*Mental Capacity—Evidence—Weight Attached to Testimony of Different Classes of Witnesses—Lay Witnesses.*—The testimony of lay witnesses as to the sanity of a person is dependent upon their capacity to judge and their opportunity for making observations. When they have made such observations, they may give their opinions based thereon as to mental capacity, but ususally the extent of the observations has been so limited, and the character of them so indefinite or inconclusive, as not to entitle them to very great weight or consideration.

4. WILLS—*Contracts—Mental Capacity—Bilateral and Unilateral Contracts.*—The degree of capacity necessary to make a bilateral contract, where mind clashes with mind, is probably a little greater than that required for a unilateral contract, or a will, but if a party has sufficient mental capacity to understand the nature and effect of the transaction, to assent to its provisions, and to know that his act is irrevocable, his contract is valid.

5. UNDUE INFLUENCE—*Species of Fraud—Proof of Undue Influence.*—Undue influence is a species of fraud, and like all other fraud must be

clearly proved, but the proof need not be direct. It may be circumstantial. It will not be inferred, but the circumstances attending a transaction may be such as to lead to the conclusion of fraud as inevitably as direct proof.

6. Undue Influence—*What Constitutes.*—Before undue influence can be made the ground for setting aside a deed or will it must be sufficient to destroy free agency on the part of the person executing the instrument. It must amount to coercion—practically duress. It must be shown to the satisfaction of the court that the party had no free will, but stood *in vinculis;* and the burden in such a case, as in a case where fraud is charged, is always on him who charges undue influence.

7. Contracts—*Mental Capacity—Evidence Held not to Show Want of Mental Capacity—Case at Bar.*—In the instant case, a suit to set aside a contract of complainant's decedent on account of mental incapacity and undue influence, a number of witnesses testified that at the time of the execution of the contract, decedent was mentally capable of entering into a contract. Among these witnesses were a nephew of decedent with whom he had lived for many years, the lawyer who prepared the contract and the family physician of the decedent. A number of witnesses for complainant testified that decedent did not have mental capacity to enter into a contract. None of these witnesses were present when the contract was made. The reasons given by these witnesses for their belief that decedent was mentally incompetent were unsatisfactory, except possibly the reasons given by a daughter of decedent, who would benefit by the setting aside of the contract.

*Held:* That the evidence for the complainant fell short of showing sufficient mental incapacity on the part of decedent as would invalidate the contract.

8. Contracts—*Inadequacy of Consideration—Contract for Support—Fraud.*—Complainant's decedent entered into a contract with defendant by which decedent released defendant from the payment of certain notes and the defendant undertook to take care of decedent for the rest of his life. As shown by the testimony of the family physician of decedent, no one, at the time, could have told the probable duration of the life of decedent.

*Held:* That the record did not show sufficient inadequacy of consideration coupled with mental weakness on the part of the decedent as would warrant the conclusion of fraud on the part of defendant.

9. Undue Influence—*Evidence Insufficient to Show Undue Influence—Case at Bar.*—The instant case was a suit to set aside a contract of complainant's decedent, on grounds of mental incapacity and undue influence. On the subject of undue influence, the evidence was very slight. There was no evidence of importunity on the part of the de-

fendant, or anyone else, nor even of a request by or in his behalf. The only attempt to show undue influence related to a threatened removal of defendant from the neighborhood. Under the contract in question complainant's decedent released defendant from the payment of certain notes in consideration of defendant taking care of him for the rest of his life. Defendant testified that there was no serious question of his removal and there was no evidence that the contract subsequently entered into was then in contemplation.

*Held:* That this did not amount to undue influence.

10. Issues to the Jury.—*Affidavit of Counsel—Failure to State Facts Rendering Case Doubtful.*—An affidavit of counsel that he was familiar with the evidence in the case and that "the case will be rendered doubtful by the conflicting evidence of the opposite parties," did not state the facts which would render the case doubtful.

*Held:* That this affidavit was insufficient to authorize an issue to the jury.

11. Issues to the Jury—*When Granted or Refused—Discretion of Court—On the Court's Own Motion—Appeal.*—While directing an issue to be tried by a jury is a matter of discretion with a court of equity, it is not an arbitrary discretion, but one to be exercised upon sound principles of reason and justice. A mistake in its exercise is just ground of appeal, and the appellate court will determine whether or not it has been properly exercised in a given case. It is error to direct an issue when it should not have been exercised, and it is equally error to fail to direct one when it should have been directed. The object of the issue is to inform the conscience of the chancellor, and for this purpose he may direct it, though not requested by either party.

12. Issues to the Jury—*When Issue Should be Granted—Case at Bar.*—The instant case was a suit to set aside a contract of complainant's decedent on the grounds of mental incapacity and undue influence. The evidence was conflicting but the weight of the evidence was overwhelmingly in favor of the mental capacity of decedent and the lack of undue influence.

*Held:* That the case was not a proper one for an issue out of chancery.

Appeal from a decree of the Circuit Court of Surry county.   Decree for defendant.   Plaintiff appeals.

*Affirmed.*

The opinion states the case.

*Frank P. Pulley, Jr.* and *Junius W. Pulley,* for the appellant.

*T. N. Crymes, Robt. W. Arnold, C. E. Holladay,* for the appellee.

BURKS, J., delivered the opinion of the court.

This was a suit to set aside a contract on account of mental incapacity and undue influence. We have decided so many cases involving these questions that the law of the subject is well settled in this jurisdiction, and there is no occasion to consider cases decided by other courts. Owing to the difference in the facts, one case affords but little aid in arriving at a correct conclusion in another. Each case must be decided upon its own facts and circumstances.

[1-3] While evidence of mental incapacity shortly before or after the principal event is admissible because it throws light on the probable mental condition at the time of such event, still the crucial time at which capacity must exist is the time of the *factum*, the time at which the act complained of was done. If mental capacity at that time is satisfactorily shown, it is immaterial what the capacity was before or after that time. In the determination of that question, however, the same weight is not attached to the testimony of all classes of witnesses. The testimony of attesting witnesses to documents and of others present at their execution is entitled to peculiar weight.[1] Physicians also, it is held, occupy a high grade on the question of mental capacity, both because they are generally men of cultivated minds and observation, and are supposed to have turned their attention to such subjects, and because they are able to discriminate more accurately than lay witnesses, and this is especially true of a family physician, who has

[1]*Beverly* v. *Walden,* 20 Gratt. (61 Va.) 147; *Huff* v. *Welch,* 115 Va. 74, 78 S. E. 579; *Wooddy* v. *Taylor,* 114 Va. 737, 77 S. E. 498; *Forehand* v. *Sawyer, ante* page 105, 136 S. E. 683.

attended the patient through the disease which is supposed to have disabled his mind.[2]  On the other hand, the testimony of lay witnesses as to the sanity of a person is dependent upon their capacity to judge and their opportunity for making observations.  When they have made such observations, they may give their opinions based thereon as to mental capacity, but usually the extent of the observations has been so limited, and the character of them so indefinite or inconclusive, as not to entitle them to very great weight or consideration.[3]

[4] The degree of capacity necessary to make a bilateral contract, where mind clashes with mind, is probably a little greater than that required for a unilateral contract, or a will, but if a party has sufficient mental capacity to understand the nature of and effect of the transaction to assent to its provisions, and to know that his act is irrevocable, his contract is valid.[4]

[5] Undue influence is a species of fraud, and like all other fraud must be clearly proved, but the proof need not be direct.  It may be circumstantial.  It will not be inferred, but the circumstances attending a transaction may be such as to lead to the conclusion of fraud as inevitably as direct proof.  The rule relating to the undue influence which will vitiate a contract has been repeatedly stated.

In *Parramore* v. *Taylor*, 11 Gratt. (52 Va.) 220, 239, it is said: "The influence to vitiate an act (says a writer of high reputation) must amount to force

[2]*Burton* v. *Scott*, 3 Rand. (24 Va.) 399; *Parramore* v. *Taylor*, 11 Gratt (52 Va.) 220; *Simmerman* v. *Songer*, 29 Gratt. (70 Va.) 9; *Cheatham* v. *Hatcher*, 30 Gratt. (71 Va.) 56, 32 Am. Rep. 650; *Montague* v. *Allan*, 78 Va. 592, 49 Am. Rep. 384; *Railway Co.* v. *Mosby*, 93 Va. 98, 24 S. E. 916; *Shacklett* v. *Roller*, 97 Va. 639, 34 S. E. 492; *Forehand* v. *Sawyer, ante* page 105, 136 S. E. 683; *Thornton* v. *Thornton*, 141 Va. 232, 126 S. E. 69.

[3]*Wooddy* v. *Taylor*, 114 Va. 737, 77 S. E. 498; *Forehand* v. *Sawyer, ante* page 105, 136 S. E. 683.

[4]*Wampler* v. *Harrell*, 112 Va. 635, 72 S. E. 135; Paige on Contracts, sections 1626, 1628; Williston on Contracts, section 256.

and coercion destroying free agency; it must not be the influence of affection and attachment; it must not be the mere desire of gratifying the wishes of another; for that would be a very strong ground in support of a testamentary act; further there must be proof that the act was obtained by this coercion; by importunity which could not be resisted; that it was done merely for the sake of peace; so that the motive was tantamount to force and fear. 1 Williams on Executors, page 39; 1 Jarman on Wills, page 29, note 1."

[6] In *Howard* v. *Howard,* 112 Va. 566, 72 S. E. 133, it is said: "Before undue influence can be made the ground for setting aside a deed or will it must be sufficient to destroy free agency on the part of the person executing the instrument. It must amount to coercion—practically duress. It must be shown to the satisfaction of the court that the party had no free will, but stood *in vinculis;* and the burden in such a case, as in a case where fraud is charged, is always on him who charges undue influence. *Jenkins* v. *Rhodes,* 106 Va. 564, 56 S. E. 332; *Hoover* v. *Neff,* 107 Va. 441, 59 S. E. 428; *Wood* v. *Wood,* 109 Va. 470, 63 S. E. 994."

See also *Wooddy* v. *Taylor,* 114 Va. 737, 77 S. E. 498; *Huff* v. *Welch,* 115 Va. 74, 78 S. E. 573; *Thornton* v. *Thornton,* 141 Va. 232, 126 S. E. 69.

[7] Applying the law as summarized above to the facts of the instant case, it seems clear that the decree of the trial court should be affirmed.

On September 11, 1922, T. G. Price conveyed to J. I. Barham a tract of seventy-nine acres of land in Surry county, for the consideration of $2,500, of which $500 was paid on January 2, 1923, and the residue was evidenced by ten negotiable notes, each for $200,

dated January 1, 1923, payable, respectively, from one to ten years after date. Price reserved a room in the house and certain privileges not necessary to mention. These notes were secured by a contemporaneous deed of trust on the land. It is conceded that the land was sold for a fair price, and that Price was in full possession of his mental faculties.

In June, 1917, Price had made a will by which he conveyed practically all of his property to his daughter, Effie E. Thomas.

Prior to 1924, T. G. Price had, for twelve or fourteen years, lived on the farm of his nephew, John R. Price, near the latter, doing his own cooking. T. G. Price for some time had suffered from endocarditis, or inflammation of the valves of his heart. In July or August, 1924, his health had failed to such an extent that his nephew was unwilling for him to remain any longer where he was, and he went to the home of his daughter. There he remained only two weeks, but was dissatisfied, and she did not want him, and he sent for J. I. Barham, at whose house he had formerly spent a good deal of time, to come and get him and take him to Barham's home. This was done and shortly after going there his physical condition greatly improved.

In October, 1924, T. G. Price went to the office of George F. Whitley, his attorney, in Smithfield, and told him that he wanted to live with Barham, and that the latter was to take care of him and pay all of his bills and expenses, and if he did so he wished to cancel the debt for the deferred payments on the land, but that he wished to retain his lien during his lifetime to insure the fulfillment of Barham's obligation. Whitley advised him that this could be done, and he then brought in Barham, and the matter was gone

over again, and Whitley was directed to prepare the contract. After some delay on the part of Whitley, the contract was prepared, bearing date October 28, 1924. T. G. Price demurred to signing at first on account of some doubt on his part whether the contract, as prepared, preserved the deed of trust intact during his lifetime, but when assured of this fact by Whitley, he did sign it. This contract recites the sale of the land, the deed of trust to secure the deferred payments, the terms of the agreement between T. G. Price and Barham, the stipulations on the part of Barham, and directs Whitley, the trustee in the deed of trust, to mark the notes "paid" and the deed of trust "satisfied," if upon his death it was found that Barham had fulfilled his contract. This Whitley did, after the death of T. G. Price, over the protest of Leonard Boothe, the executor named in the will of Price. Thereupon this suit was brought by the executor, assailing the validity of the contract of October 28, 1924, between T. G. Price and Barham, on the ground that Price was mentally incapable of entering into the contract, and that it was procured by the undue influence of Barham over Price.

Dr. Easley was the family physician of T. G. Price from October, 1923, until he died on December 24, 1924. He states that Mr. Price had endocarditis, or inflammation of the valves of the heart; that this made him nervous, caused indigestion, restlessness, sleeplessness, and the like, but that he had known "people to be very bad off and live to a really old age with it." He is very positive in his statements that the mental condition of Mr. Price was at all times good, and that he was fully competent to transact business; that he was in his office about October 30, 1924, to pay a bill which he had against him, and that his mind was then in good

condition. This was just two days after the contract was entered into. He says that Mr. Price stated to him at that time that he was done with doctor's bills for the future; that Mr. Barham was to pay his doctor's bills thereafter; and that he had no question about his capacity to enter into a contract about that time.

Mr. Whitley, who prepared the contract, says that Price came alone to see him some time before the contract was drawn; that Price went over the whole situation with him, and told him what he wanted to do, and asked if it could be accomplished. He told him that there was no difficulty about the matter, and afterwards that Price went out and got Mr. Barham, and brought him in, and they went over the whole subject again to see if what was proposed was agreeable to each of the parties. He was busy about other matters just at that time, and delayed preparing the contract, but he did finally prepare it and had it ready when Price and Barham returned together; that Price had some hesitation about signing it, because he was doubtful whether the language of the contract was such as would keep the deed of trust in force during his lifetime, but when satisfied of this, he executed the contract and seemed to be entirely satisfied with it. He says he got his first ideas on the subject from Mr. Price, and "his idea was very simple and plain." He expresses no doubt as to the mental capacity of Mr. Price to enter into the contract, and says that he would not have hesitated to enter into a contract with him himself at that time.

John R. Price was the nephew of T. G. Price, with whom the latter had lived some twelve or fourteen years before moving to Mr. Barham's. He says that T. G. Price consulted him beforehand about entering into the contract with Barham, and that he declined to

advise him either way, and told him to do exactly as he chose about it. He further states, however, that the contract embodied just what T. G. Price wished to accomplish; that he was present when the contract was executed; that Price was fully capable of entering into a contract at that time, and while his health was not good, his mental condition was, and that he expressed his entire satisfaction with the contract. He also states that he thought the contract was a beneficial one for T. G. Price, and that T. G. Price's daughter seemed to be unwilling to take him and care for him; that she said to him she didn't see how she could take him.

The defendant, Mr. J. I. Barham, was also present at the time when the contract was executed, and goes into detail to show the desire of T. G. Price to live with him, and to enter into the contract which they made. Both he and his wife testified as to the mental capacity of T. G. Price at that time.

Some ten or a dozen other witnesses, some of them related to the defendants, and others not, who were mere neighbors, but who had talked frequently with T. G. Price, testified that his mental capacity was good at or about the time the contract was executed. Some of them say that he was a man of independent views and not easily influenced.

On the other hand, eight witnesses were examined on behalf of the appellant. One of them, C. G. Gwaltney, testified that when he last saw Price his mind "seemed to be all right."

Another one, E. E. West, says that sometimes he was capable of making a contract and at others not.

Two other witnesses, Land and Murray, testified that they did not think T. G. Price was mentally capable of entering into a contract, but they state no sufficient reasons upon which to base their opinions.

Another witness, W. Z. Holland, testified that Price did not have mental capacity to enter into a contract. He testifies as to his acquaintance with him, and of some things he had seen, and others he had heard, but in some of his statements he is quite extravagant. In one place he says two-thirds of the people in the neighborhood thought that he was crazy, and in another, that every person, white and colored, knew that his mind was not right; and when asked why the witnesses to that effect were not brought there, simply said that they had not been summoned.

None of the witnesses for the appellant were present when the contract was made.

The complainant, Leonard Boothe, thought that Price was not mentally capable of making a contract, and while he gives some reasons for his opinion, they are not of a very substantial nature. His wife testifies that Price did not seem to be himself, though she admits he sometimes talked intelligently, and at others not, and that she had heard him say "he could not remember things."

The only other witness for the appellant was Mrs. Effie Thomas, the daughter of T. G. Price. She testified that her father's mind had given way to such an extent that he was practically crazy, and was incapable of entering into a contract; that he was very nervous and ate very little; at times he did not recognize her. She says that "he would go to his trunk and take out every piece, go up and down the stairs; go out in his night clothes and walk over the fields" without his shoes on; that "he was afraid of everything," and that "he got so crazy I could not handle him."

Tested by the rules hereinbefore stated, these statements of witnesses for the appellant fall far short of

showing such mental incapacity on the part of T. G. Price as to invalidate the contract in controversy.

[8] As shown by the testimony of Dr. Easley, no one could foretell the probable duration of the life of T. G. Price, and the record does not show such inadequacy of consideration, coupled with mental weakness on the part of T. G. Price, as would warrant the conclusion of fraud on the part of J. I. Barham.

[9] On the subject of undue influence, the evidence is very slight. There is no evidence of any importunity on the part of Barham, or of anyone else, nor even of a request by or in his behalf. The only attempt to show undue influence relates to the threatened removal of Barham to Norfolk. The complainant, Leonard H. Boothe, and his wife testified that about the middle of October, 1924, they received a letter from T. G. Price saying "that Mr. Barham was speaking about giving up the place and leaving, and he did not know what he was going to do," and that the next day Price wrote to them not to say anything about the letter as it might make Mr. Barham mad. This letter was not produced; Boothe testifying that "I did not think it would be of any value, so I destroyed it." Barham never left the place, and it does not appear that he ever intended or threatened to leave it. What took place on the subject is thus detailed by Barham in his testimony, on cross-examination:

"Q. You were thinking about leaving the county, leaving that farm, weren't you?

"A. No, I never thought about leaving. The only thing that was said about it was some of my wife's relations were visiting us and they got after us about coming to Norfolk with them. There was nothing definite said about it.

"Q. You mean there was no definite decision made.

"A. Well, put it that way.

"Q. But you all did seriously talk about it, didn't you?

"A. Not seriously. I never had any idea of moving away. My wife's niece, she may have been serious about it but we weren't—just joking.

"Q. That was the summer of 1924. Do you remember what time?

"A. Sometime in September or October. She stayed there practically two months.

"Q. What was she suggesting that you do up there?

"A. She didn't have any particular thing in mind. I could do any laborer's work.

"Q. What kind of work?

"A. I don't know what kind of work.

"Q. What kind of work could you do besides farming?

"A. I could do most any kind of manual labor.

"Q. And that was what you all were discussing.

"A. Yes.

"Q. Mr. Price was there, wasn't he?

"A. Mr. Price was there on the porch talking with us."

This did not amount to duress, nor to undue influence, nor is there any evidence that the contract subsequently entered into was then in contemplation. Price was there simply on a visit, as he had been on former occasions. As to previous visits, Mrs. J. I. Barham testified: "In 1919, I would say in October, he came and he lived with us all of 1920, and stayed with us part of 1921 and 1922." His letter to Boothe may have simply referred to the apprehension of a disturbance of his visit. It cannot be accepted as

evidence of undue influence in the absence of any other evidence to that effect.

[10-12] It is assigned as error that the trial court did not order an issue out of chancery. This assignment is based on the affidavit of counsel that he is familiar with the evidence in the case, and that "the case will be rendered doubtful by the conflicting evidence of the opposite parties," without stating the facts which would render the case doubtful. This is just the kind of affidavit which was condemned as insufficient in *Stevens* v. *Duckett*, 107 Va. 17, 57 S. E. 601. But the trial court would have committed no error if the application had been renewed after the depositions were taken. It was not a proper case for an issue. The rule relating to such issues is thus stated in *Catron* v. *Norton Hardware Co.*, 123 Va. 380, 386, 96 S. E. 853, 855: "While directing an issue to be tried by a jury is a matter of discretion with a court of equity, it is not an arbitrary discretion, but one to be exercised upon sound principles of reason and justice. A mistake in its exercise is just ground of appeal, and the appellate court will determine whether or not it has been properly exercised in a given case. It is error to direct an issue when it should not have been exercised, and it is equally error to fail to direct one when it should have been directed. The object of the issue is to inform the conscience of the chancellor, and for this purpose he may direct it, though not requested by either party. *Morgan* v. *Booker*, 106 Va. 369, 56 S. E. 137; *Helm* v. *Lynchburg Trust & S. Bank*, 106 Va. 603, 56 S. E. 598; *Ewan* v. *Louthan*, 110 Va. 575, 66 S. E. 869; *Miller* v. *Wells* [Wills], 95 Va. 337, 28 S. E. 337; *Stevens* v. *Duckett*, 107 Va. 17, 57 S. E. 601; *Shoemaker* v. *Shoemaker*, 112 Va. 798, 72 S. E. 684." ·

See also *Hook* v. *Hook*, 126 Va. 249, 101 S. E. 223; *Bunkley* v. *Com.*, 130 Va. 55, 108 S. E. 1.

There is no error in the decree of the trial court.

*Affirmed.*