### BOWIE v. SORRELL et al.
#### Civ. No. 300.

United States District Court
W. D. Virginia, Lynchburg Division.
June 18, 1953.

Coleman & Gibson and Bascom S. Pribble, Jr., Fredericksburg, Va., and Perrow & Rosenberger, Lynchburg, Va., for plaintiff.

Caskie, Frost, Davidson & Watts, Lynchburg, Va., and C. O'Conor Goolrick, Fredericksburg, Va., for defendants.

BARKSDALE, District Judge.

On October 31, 1952, plaintiff, Adrian L. Bowie of Stafford County, Virginia, near Fredericksburg, instituted this action by way of motion for judgment in the Circuit Court of Campbell County, Virginia, against defendants, Arthur Keith Sorrell of Warren, Michigan, Keith Duane Freel of Detroit, Michigan, operators of, and Baker Driveaway Company, Inc., of Detroit, Michigan, owner of two motor vehicles which plaintiff averred had collided on November 2, 1951, in Campbell County near Lynchburg, causing him serious personal injuries, and moved for a judgment in his favor for the damages sustained by him. The action was duly removed to this court on the ground of diversity of citizenship, and defendants answered, setting up *inter alia* the defense that plaintiff had compromised and settled his claim for damages, accepted the sum of $5,000 in full settlement, and executed a valid release. Plaintiff filed his "Objection" to defendants' allegations as to the release, asserting therein that the release was invalid by reason of fraud, undue influence, harassment and misrepresentations on the part of the defendants, and that the release was obtained when the plaintiff was too ill to understand the extent and without knowledge of his injuries, that therefore the release was not his voluntary act and deed, and asked that it be declared null and void. Defendants had theretofore demanded a jury trial as to all issues except the issue of the validity of the release. Plaintiff demanded a jury trial as to this issue also. Thereupon, defendants moved the court for a separate trial on the issue of the validity of the release, and that on this issue a jury trial be denied upon the ground that the matter of determining the validity of an executed release was properly cognizable in equity, and therefore plaintiff was not entitled to a jury trial on this issue. A pretrial conference was held, and argument of counsel was heard on the procedural questions presented, plaintiff insisting that he be awarded a single jury trial for the determination of all the issues in the case.

As the release had been obtained by the adjuster for the insurance company covering the public liability of the defendants, it seemed obvious that, if all issues were tried at one time with a jury, the fact of the defendants' insurance coverage would inevitably be made known to the jury. In Virginia, it has been consistently held that evidence as to insurance coverage is inadmissible and prejudicial to a defendant and the admission of such testimony or argument of counsel disclosing insurance coverage is reversible error. Lorillard v. Clay, 127 Va. 734, 104 S.E. 384; Lanham v. Bond, 157 Va. 167, 160 S.E. 89; Worrell v. Worrell, 174 Va. 11, 4 S.E.2d 343; Bloxom v. McCoy, 178 Va. 343, 17 S.E.2d 401. Therefore, it seemed clear to me that defendants were entitled to a separate trial on the issue of the validity of the release, and it was so ordered.

Upon the question of whether, notwithstanding defendants' opposition, the plaintiff was entitled to a jury trial on this issue, the situation seemed to be that the trial of this issue was clearly in the nature of an equitable action to set aside and declare invalid an executed instrument. Chesapeake & Ohio Railway Co. v. Mosby, 93 Va. 93, 24 S.E. 916. As the issue would be one "not triable of right by a jury", it seemed to me that I could not properly order a jury trial. It is true that I might have impaneled an advisory jury under the provisions of Rule 39(c), Fed.Rules Civ.Proc., 28 U.S.C.A.; but as neither party had requested an advisory jury and I was of the opinion that an advisory jury would not be

helpful as the duty of the final determination of the facts would rest upon the court, I denied plaintiff's demand for a jury trial, and set the case for trial upon the issue of the validity of the release by the court without a jury. The trial was had on April 20, 1953, and subsequently, memoranda have been filed and oral argument of counsel has been heard.

Defendants have also filed a motion for summary judgment upon the ground that the plaintiff not having returned or tendered the $5,000 received by him in settlement as consideration for the release, he cannot maintain this action. However, by agreement of counsel, this issue is not now before the court for determination, it having been agreed between counsel that the determination of this issue (should such a determination be required) should be deferred until after the determination of the issue as to the validity of the release.

### Findings of Fact.

This action having been tried upon the facts without a jury, the court doth hereby find the facts specially and states separately its conclusions of law thereon, and directs the entry of the appropriate judgment.

Plaintiff received severe burns from an automobile accident which took place on November 2, 1951, on Route 460, between two and three miles east of Lynchburg. At that time plaintiff was an enlisted man in the United States Air Force, and was proceeding, pursuant to orders, from a station in Texas to a new station. Plaintiff was married, but separated from his wife and two small children. His father and mother, and several brothers and sisters, lived in or near Fredericksburg. Plaintiff finished the Seventh Grade, served in the Army 1945–1947, was employed 1947–1950, but had owned no property and had no bank account. Plaintiff was traveling with one Hazel Watts in an automobile owned jointly by them. She had been married, but was separated from her husband, and lived in Fredericksburg, but had been employed for some months at or near the camp in Texas at which the plaintiff was stationed. The accident in which plaintiff was injured involved seven vehicles in all. There was an explosion, which resulted in severe burns to plaintiff.

Immediately after the accident, plaintiff was taken to a civilian hospital in Lynchburg where he remained for several days, and was then taken to the Army hospital at Camp Pickett, arriving there about November 6th. Upon being admitted to the Camp Pickett hospital, plaintiff's body was almost completely covered with bandages. His bandages being removed a week later, it was found that he had burns up to third degree on his torso, and his lower extremities were almost covered with third degree burns. Approximately 50 percent of plaintiff's skin surface was burned, and burns of that severity are frequently fatal. Plaintiff was in critical condition all the time he was at Camp Pickett and until he was transferred to Walter Reed Hospital on April 24, 1952. Plaintiff did not suffer as much pain at first, as he did later, because skin grafting was not undertaken immediately. During his stay at Camp Pickett, some twenty-seven skin grafting operations were performed, and he was given frequent blood transfusions. During the time he was at Camp Pickett, he fell off from approximately 180 pounds to approximately 108 pounds. During all the time he was at Camp Pickett, narcotics were administered daily, as well as sedatives.

On November 13, 1951, Reid, an insurance adjuster, visited him with a court reporter, and took a twenty-two-page question-and-answer statement from him, which would indicate that his mental condition was reasonably good. However, he was then having less pain and taking fewer narcotics than later. The insurance adjuster, Reid, presently twenty-five years of age and serving in the United States Army, entered the employment of Markel Service, insurance adjusters for the casualty insurance company here involved, on June 26, 1950. While so employed, he was taking a two-year course in law at Smithdeal-Massey Business College in Richmond. Prior to January 29, 1952, he had successfully completed the law course, but had not taken the Virginia bar examination, nor has he yet. A number of witnesses testified favorably as to his good character.

Reid returned to see plaintiff on November 23rd, but as plaintiff was drowsy, he did not talk to him. He returned on December 19th, but did not see plaintiff, as the nurse on duty would not permit it. On December 28th, Reid returned and talked to plaintiff for an hour or more. During this visit, settlement was discussed for the first time, but no agreement was reached, plaintiff saying that he had in mind a pretty high figure. On January 2, 1952, Reid returned with his superior, Mr. Gornto, and again discussed settlement, but plaintiff would state no figure. However, Reid left his name and telephone number and suggested that plaintiff call him when he wanted to see him again. On January 25th, plaintiff called the insurance adjuster's office in Richmond and left word with Mr. Gornto that he wanted to see Reid, so it was agreed that Reid would call on January 29th. When Reid arrived, they discussed settlement, and plaintiff told him he would settle for $10,000. Reid told Bowie that he had no medical expenses, as he was in an Army hospital, was losing no wages, and that, whatever he got in settlement would be clear, tax-free money, and offered to settle for $2,500 or $3,000. Reid made no false statements during the conversation. Bowie told Reid that the reason he wanted to settle that day was because his wife had been to see a lawyer and he was afraid she might get the settlement. Plaintiff declined Reid's offer, but said he would settle for $5,000. Thereupon, Reid called his superior Gornto on the telephone and asked for authority to settle for $5,000. Gornto authorized such settlement, provided a certificate could be obtained from plaintiff's doctor that he was in proper mental and physical condition to make the settlement.

On the preceding day, January 28, 1952, Bowie had doses of ⅟₃₂ of a grain of dilaudid at 4:00 a. m., 9:30 a. m., 1:30 p. m., 6:00 p. m., and 10:00 p. m., and at 10:30 p. m., he had 1½ grains of nembutal. Dilaudid is a synthetic narcotic, and ⅟₃₂ of a grain is about the equivalent of ¼ of a grain, the usual dose, of morphine. The taking of dilaudid tends to relieve pain and to give the patient a sense of euphoria, that is, a sence of well-being and optimism.

Nembutal is a sedative given to induce sleep. On January 29th, the day of the execution of the release, Bowie had the following dosages of dilaudid: ⅟₃₂ grain at 5:30 a. m., ⅟₃₂ at 10:00 a. m., ⅟₃₂ at 3:00 p. m., and ⅟₃₂ at 7:00 p. m. and 1½ grains of nembutal at 11:00 p. m. The narcotics and sedatives which the plaintiff was receiving on January 28th and 29th were definitely enough to keep him to some extent under the influence of the drugs the entire twenty-four hours of each day. Bowie also had a blood transfusion on January 29th. Besides the dilaudid and nembutal, Bowie was getting around a grain and a half of whisky before each meal.

Pursuant to the instructions of his superior, Reid wrote out a statement, which is as follows:

"I, the undersigned, certify that Adrian Bowie is mentally alert and has full control of his faculties and is mentally capable of entering into an agreement and or to contract, and in my opinion has full knowledge of what he is doing. January 29, 1952.",

and at Reid's request, plaintiff's doctor, Captain Kambe, signed it. Dr. Kambe was reluctant to sign the statement, and in any event wished to add to the statement, "He is under the influence of narcotics." However, Reid objected, and told him such an addition was unnecessary because Bowie's chart would show that he was taking narcotics. Dr. Kambe had heard from someone in the ward that Bowie was to get $15,000 in the settlement, and he knew that, unless he signed the statement, the settlement would not go through, and Bowie had told him that he wanted to make the settlement because he wanted to buy a new car. Consequently, Dr. Kambe signed the statement, although, as he testified in court, at the time of signing it he was of the opinion that by reason of Bowie's mental and physical condition, he could not fully grasp a situation in a business transaction, know the relative values, and recognize the consequences of his act.

I find as a fact that, at the time of the making of the settlement and the execution of the release, Bowie was legally incapable of entering into a valid contract

by reason of his mental and physical condition.

After securing Dr. Kambe's signature to the statement quoted above, Reid delivered his company's draft for $5,000 to plaintiff about 4:30 p. m., January 29th, had plaintiff execute the release, and left. Plaintiff never complained to Reid or his office of the settlement until this suit was brought. When plaintiff got the $5,000 draft, he had a ward boy take it to the hospital office until plaintiff was moved to Walter Reed Hospital on April 24, 1952, when it was forwarded to the hospital office at Walter Reed and remained there until June 12, 1952.

When plaintiff was moved to Walter Reed hospital, he was much improved. Although there were unhealed donor sites from skin grafts, and some of the grafts had sloughed and were infected, the infection was "essentially overcome within a period of two to three weeks following the admission", and by June, he was about 98 percent covered with skin, his problem thereafter being one of rehabilitation directed at increasing the range of motion in his joints. Plaintiff continued to receive narcotics for a time after he was transferred to Walter Reed. Initially he was on dilaudid as well as codeine, but this narcotic treatment was not over a long period of time. By June 13th, plaintiff's burns were completely healed and he had "begun assisted ambulation". He then had progressed sufficiently to be allowed to go home on week ends. He had gained in weight from 108 pounds to 136 pounds.

During the period of June 1st to June 15, 1952, plaintiff's recovery had progressed very satisfactorily in every respect. "At that particular time in June, * * *, his condition was extremely satisfactory from everyone's viewpoint."

On June 12, 1952, plaintiff had been allowed to go home to Fredericksburg, and while there he decided to buy a used automobile so that his brothers might have a means of transporting him to and from Walter Reed Hospital. On June 13, 1952, he and his two brothers made arrangements for him to buy a used car from a Fredericksburg dealer for $2,095. He tendered the $5,000 draft which he had obtained from Reid in the settlement to the used car dealer, who did not have available enough cash to pay him the balance after deducting the purchase price of the used car, so plaintiff and his two brothers went to the National Bank of Fredericksburg and deposited the draft. On the face of this draft there had been written in pen and ink, "Settlement in Full". Printed on the back thereof under the word "Endorsement", there appeared:

"The undersigned, by the endorsement of this draft, acknowledges receipt and accepts same in full settlement and final discharge of any and all claims or demands by reason of any damage, loss or personal injury which heretofore has been or which hereafter may be sustained by the undersigned in consequence of an accident occurring on or about ——————."

He talked to a teller at the Bank, told him just how the accident occurred, in detail, appeared to be normal except underweight, deposited his draft, and drew $250 in cash. Previously, he had given the used car dealer a check for the purchase price of the car.

I find as a fact that on June 13, 1952, and for the several weeks preceding that date, the plaintiff was not taking narcotics, was not suffering pain, was in full control of his mental faculties, and was fully capable of understanding the nature and consequences of his acts.

Plaintiff and his brothers continued to use the car, and plaintiff continued to make withdrawals from the balance which he had left in the Bank. He made no large purchases, but by the end of the year he had spent all of this money. Plaintiff testified that he knew he had been cheated when he went to Walter Reed Hospital on April 24, 1952. However, during all this time, he made no complaint to the insurance adjuster or any one else about his settlement, and not until his money was about gone did he consult a lawyer, Mr. Pribble, some time in October 1952.

I make no findings as to whether or not the $5,000 paid in settlement was inadequate, as I do not consider the evi-

dence before me sufficient to make a definite finding on this matter. It is true that the plaintiff sustained painful and severe injuries which necessitated hospitalization from November 2, 1951, until October 31, 1952. The pain and suffering during a considerable part of that time was constant and acute. Plaintiff has certainly sustained permanent injuries to some degree. On the question of liability, the only evidence before me is the question-and-answer statement taken from the plaintiff by Reid on November 13, 1951, which indicates liability. However, the record does not disclose what the defendants and other witnesses might say. The amount paid in settlement was substantial. Such a sum, obtained without the necessity of payment of lawyers' fees, would certainly seem to me not to be so grossly inadequate as to shock the conscience. In the case of Ciletti v. Union Pacific R. Co., 2 Cir., 196 F.2d 50, a release executed by a man and his wife for the consideration of $1,500 as to the wife and $5,000 for the husband, was set aside as fraudulent. In all the other cases which I have read on the subject, where releases were set aside, they were in consideration of nominal or relatively small sums of money.

### Comments.

In certain particulars, the evidence in this case is conflicting. Plaintiff contends that one reason for his execution of the release on January 29, 1952, was the harassingly frequent visits of Reid and his importunate insistence upon settlement. Plaintiff's evidence as to this is vague and unimpressive. The evidence convinces me that Reid only saw the plaintiff on the occasions set out in my findings of fact, and that he did not unduly urge settlement on the plaintiff. I am satisfied that Reid's visit of January 29, 1952, was pursuant to the telephoned request of the plaintiff.

Plaintiff also contends that Reid induced him to accept the settlement offered and execute the release, by one (and only one) false and fraudulent misrepresentation. Plaintiff testified that on Reid's visit of January 29th, Reid told him that, if anything happened to him (meaning that if he should die), his people could not get any-thing by reason of his injury, and that a settlement would help them out. Reid denied making any such statement on January 29th, or on any other occasion. No circumstance corroborates plaintiff's testimony that Reid made this statement. In fact, the circumstances strongly indicate to me that no such statement was made, and that if any such statement had been made, it would have had no particular influence on the plaintiff. In the first place, although plaintiff was in a precarious condition, he himself confidently expected to recover. There is nothing in the evidence to indicate any desire of the plaintiff to provide for his family. It does not appear that either his parents or his brothers or sisters were in any way dependent upon him or that he had ever contributed anything to them. It is uncontroverted that he was on bad terms with his wife, who had custody of their children, and he had for some time been separated from her. The evidence indicated that he was quite intimate with his traveling companion, Hazel Watts, a married woman living apart from her husband. The evidence of Reid that the plaintiff told him on January 29th that he wanted to settle that day because his wife had been to see a lawyer and he was afraid she might get a part of the settlement, seems to me to be much more plausible.

### Conclusions of Law.

There are two questions here presented for determination:

(1) Whether or not the release executed by the plaintiff on January 29, 1952, was valid when executed; and

(2) If the release was not valid when executed, whether or not it was ratified by the subsequent conduct of the plaintiff.

Upon the first question, it is my conclusion that the release executed by plaintiff on January 29, 1952, was voidable when executed, by reason of the mental incapacity of the plaintiff and the constructive fraud of defendant's agent Reid.

The matter of the mental capacity of the plaintiff at the time of the execution of the release seems to me to be a very close question. It is undisputed that the plaintiff was sufficiently alert mentally to do

some bargaining as to the amount he was to receive, that he knew the nature of the transaction and understood that he was receiving the amount agreed upon and that he was executing a release. As is said in 17 C.J.S., Contracts, § 133, p. 479:

"It is essential to the validity of a contract that the parties thereto possess not only the legal status affording capacity to contract, * * *, but also the mental competence affording capacity to consent. To make a valid contract each party must be of sufficient mental capacity to appreciate the effect of what he is doing and must also be able to exercise his will with reference thereto.

"There is no contract where one of the parties was, by reason of physical debility, age, mental aberration, or otherwise, incapable of understanding and appreciating the force and effect of the agreement he is alleged to have made, as where he was unable to do so because insane, mentally infirm, * * * or any other defect or disease of the mind, whatever the cause, or because suffering from a degree of intoxication precluding rational thought, * * *; but mere mental weakness falling short of incapacity to appreciate the business in hand will not invalidate a contract; physical condition not adversely affecting mental competence is immaterial, and neither age, sickness, extreme distress, nor debility of body will affect the capacity to make a contract or a conveyance, if sufficient intelligence remains to understand the transaction."

In Price's Executor v. Barham, 147 Va. 478, 482, 137 S.E. 511, 512, the court said:

"The degree of capacity necessary to make a bilateral contract, where mind clashes with mind, is probably a little greater than that required for a unilateral contract, or a will, but, if a party has sufficient mental capacity to understand the nature of and effect of the transaction, to assent to its provisions, and to know that his act is irrevocable, his contract is valid."

In the same opinion, the court also said that the law on the subject of mental in-

capacity was well settled in Virginia, but that (147 Va. at page 481, 137 S.E. at page 512):

"Owing to the difference in the facts, one case affords but little aid in arriving at a correct conclusion in another. Each case must be decided upon its own facts and circumstances."

■ In the instant case, it is undisputed that at the time of executing the release the plaintiff was in almost constant pain, that he was in a critical physical condition, that he was frequently undergoing painful skin-grafting operations, and that he was constantly under the influence of narcotics. Therefore, notwithstanding the fact that the plaintiff generally understood what he was doing, it is nevertheless my conclusion that he could not and did not fully comprehend the nature and consequences of his act, and it is therefore my conclusion that, at the time of its execution, the release was voidable by reason of the plaintiff's mental incapacity.

■ On the subject of fraud, in the case of Moore v. Gregory, 146 Va. 504, 131 S.E. 692, 697, the court said:

"Fraud may be actual or constructive. What is actual and what constructive fraud has been defined by text-writers without number, and by all of the courts of this country. The definition given in 26 Corpus Juris, pp. 1060, 1061, has well epitomized the law on this subject:

" 'Actual fraud is intentional fraud; it consists in deception, intentionally practiced to induce another to part with property or to surrender some legal right and which accomplishes the end designed.

" 'Constructive fraud is a breach of legal or equitable duty, which irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud. An intent to deceive is an essential element of actual fraud.

The presence or absence of such an intent distinguishes actual fraud from constructive fraud.'"

It follows from my findings of fact that no intentional fraud was practiced on the plaintiff by defendant's agent Reid. Therefore, there was no actual fraud. I do not believe that it was Reid's intention to impose upon the plaintiff nor take advantage of him. However, it is my conclusion that he did just that, and I attribute his mistake to his youth and inexperience.

It is undisputed that the plaintiff was in a critical condition in a hospital far removed from his family and friends. He did not have the benefit of the independent advice of any one, and these facts were known to Reid. While Reid was not a lawyer, as was defendant's agent in Sainsbury v. Pennsylvania Greyhound, 4 Cir., 183 F. 2d 548, 21 A.L.R. 266, he had completed a law course and was entitled to take the Virginia bar examination. The plaintiff was in the course of undergoing treatment which caused him great pain and suffering, and was in a critical condition. Although neither plaintiff nor Reid knew the full extent of plaintiff's injuries, Reid was better advised on this subject than was plaintiff. And to my mind, more important than anything else, plaintiff was undoubtedly under the influence of narcotics at the time he executed the release, and Reid knew it. Undoubtedly, Reid was conscious of the fact that the propriety or legality of having plaintiff execute a release under the existing circumstances was doubtful, because he was advised by his superior not to make the settlement and obtain the release unless he could obtain a certificate from plaintiff's doctor as to his mental capacity. It is true that no fiduciary relationship existed between the plaintiff and Reid, but it cannot be said that they stood upon an equal footing. I am not willing to put the stamp of the approval of this court upon a release obtained under the circumstances here disclosed. I am prepared to hold, and do hold, that the circumstances of this case constitute a case of constructive fraud, notwithstanding the absence of false misrepresentations.

There were other matters involved in the case of Union Pacific R. Co. v. Harris, 158 U.S. 326, 15 S.Ct. 843, 845, 39 L.Ed. 1003, but on this subject the court approved an instruction of the lower court, which in part said:

"* * * 'when it appears that either party is in a situation as to his health, physical condition, or as to the state of his mind that makes it probable that he acted without deliberation, without an understanding of the act with which he is charged, the instrument itself may be disregarded'; * *."

Although not directly in point, see also Flowers v. Virginian Ry. Co., 135 Va. 367, 116 S.E. 672; Bedser v. Horton Motor Lines, 4 Cir., 122 F.2d 406; E. I. Dupont de Nemours v. Kelly, 4 Cir., 252 F. 523, and Capital Traction Co. v. Sneed, 58 App.D.C. 141, 26 F.2d 296.

■ However, on the second question, that is, whether or not plaintiff by his subsequent conduct ratified the settlement and release, I do not feel any doubt. Even though it be conceded that plaintiff was in no condition to give serious consideration to the matter so long as he was in the hospital at Camp Pickett, unquestionably he was much improved when he was transferred to Walter Reed Hospital on April 24, 1952. Plaintiff himself testified that by that time he knew that he had been cheated. As a matter of fact, I gravely doubt the truth of this testimony, as it is my belief that the plaintiff was not dissatisfied with his bargain until about the time he had spent all his money and began to wonder if he might not have obtained more. In any event, plaintiff at no time made any complaint to anybody until October, 1952, and so far as the record shows, he made no complaint to defendant until the institution of this action. By early June, plaintiff had ceased to require narcotics, he was not suffering, but was in a state of convalescence. Having found as a fact that, on and substantially before June 13, 1952, plaintiff was in full possession of his mental faculties, and fully aware of the nature and consequences of his acts, the conclusion seems to me inescapable that the plaintiff ratified the voidable contract when

he, on June 13, 1952, deposited the draft which he had obtained in the settlement and proceeded to use the proceeds thereof. The draft, on its face, plainly bore the notation, "Settlement in Full", and printed on the back thereof was the statement that the draft had been accepted in full settlement of all his claims.

 Although the facts in the following cases are quite dissimilar to the instant case, the following quotations state the rules prevailing in Virginia as to ratification:

"It is, of course, true that one who with full knowledge of the facts accepts the benefits of and performs a contract to which he says his assent has been induced by misrepresentation or fraud, thereby waives the fraud complained of." Poff & Co. v. Ottaway, 191 Va. 779, 786, 62 S.E.2d 865, 869.

"A contract tainted with fraud is not void, but voidable. Therefore great punctuality and promptness of action are required by the deceived party upon his discovery of the fraud. * * * If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of and relief from the misrepresentations. * * * And this duty promptly to disaffirm a fraudulent transaction is not dependent upon the proof of injury by the delay to the other party." West End Real Estate Co. v. Claiborne, 97 Va. 734, 34 S.E. 900, 906.

"Where a party desires to rescind, upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be as conclusively bound by the contract, as if the mistake or fraud had not occurred. * *" Grymes v. Sanders, 93 U.S. 55, 23 L. Ed. 798.

It follows that an order will be entered dismissing this action at the costs of the plaintiff.