960 F.2d 145
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
William Alfred BIGGER, JR., Plaintiff-Appellant,
v.
John DOE; STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
Defendants-Appellees.
 No. 91-1743.
 United States Court of Appeals,
Fourth Circuit.
 Argued: February 6, 1992
Decided: April 23, 1992
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. James R. Spencer, District Judge. (CA-90-631-R)
 ARGUED: John Bertram Mann, LEVIT & MANN, Richmond, Virginia, for Appellant.
 James Willard Walker, MORRIS & MORRIS, Richmond, Virginia, for Appellees.
 E.D.Va.
 AFFIRMED.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, ERVIN, Chief Judge, and NIEMEYER, Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 William Alfred Bigger, Jr., seeks to set aside his release of a personal injury claim given to State Farm Insurance Company, contending that (1) he lacked capacity to give a release at the time he signed the settlement papers, (2) the release was procured through duress or undue influence, (3) State Farm acted fraudulently or in bad faith, and (4) the release was the product of mutual mistake. The district court, ruling that Bigger failed to advance sufficient evidence to support his claims, granted State Farm's motion for summary judgment. This appeal followed.
 
 
 2
 While the proper resolution of this case depends on a factual analysis, we recognize that if facts of record and the fair inferences to be drawn from them, when considered in the light most favorable to Bigger, establish a prima facie showing to support any theory advanced by him, we would be required to remand the case for trial. On the other hand, if the facts, considered in this manner, fail to justify proceeding further to trial, then we would affirm. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1985). The analysis is to be conducted by us de novo. See Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1127-28 (4th Cir. 1987).
 
 
 3
 After careful consideration of the entire record, we are satisfied that the facts that Bigger has advanced fail to support any of the grounds alleged for setting aside the release given by him. On the contrary, the record shows that he understood the nature and effect of the release at the time he signed the settlement papers. Although the record demonstrates that Bigger felt pressure from his mother and the immediacy of outstanding bills to agree to an early settlement of his personal injury claim, there is no evidence that State Farm acted improperly.
 
 
 4
 The underlying facts are not disputed, nor are the circumstances of Bigger's settlement with State Farm. Late in the evening, on October 15, 1988, when Bigger was driving a borrowed automobile south on Interstate 95 in northern Virginia, an unidentified vehicle pulled along beside him and the operator, who was unknown to Bigger, fired a gun at Bigger, the bullet grazing Bigger's head. Bigger lost control of his vehicle and ran into an embankment, causing personal injury. The driver of the other vehicle was never apprehended, or even identified.
 
 
 5
 Over the next few weeks, Bigger was examined and treated in various medical facilities by a number of physicians. Dr. Kim Harris, a neurologist, apparently found that Bigger sustained brain injury as a result of the accident and referred Bigger to Dr. Frank Lira for a determination as to whether Bigger was "disabled" for the purpose of claiming social security disability benefits. Dr. Lira evaluated Bigger in November and December of 1988. In his report, Dr. Lira noted that Bigger complained that since the accident he had" become increasingly confused, disoriented, unable to concentrate, emotional[ly] withdrawn, and severely depressed." Dr. Lira described Bigger as a "rather withdrawn, nonverbal, passively cooperative individual," and stated:
 
 
 6
 INTELLECTUAL EVALUATION: With a chronological age of 30-Mr. Bigger achieved a Verbal I.Q. of 69, a Performance I.Q. of 66, and a Full Scale I.Q. of 66 which places him in the mentally deficient range of intelligence. These scores likely represent marked deterioration in his intellectual abilities as it is suspected Mr. Bigger was at one point in time at least an individual with average intellectual endowment.***
 
 
 7
 Within performance areas, Mr. Bigger was unable to concentrate well for extended periods of time and could not solve tasks that required the use of logical thought processes. In addition, due to marked psychomotor retardation, he was unable to use newly presented information in a rapid and efficient manner.
 
 
 8
 On January 5, 1989, Bigger was admitted to the McGuire Veteran's Administration Hospital in Richmond for inpatient treatment. His principal diagnosis upon admission was post-traumatic stress disorder. His treatment there was under the supervision of Dr. Kevin E. Gorin.
 
 
 9
 Shortly after the incident and some two months before he entered the hospital, Bigger made a claim under the uninsured motorist and medical payment coverages of the policy issued by State Farm on the automobile that Bigger was driving. The policy had a $25,000 limit under these coverages. Over the next three months, Bigger and his mother were in regular contact with State Farm's claims representative, Diane Jones. They presented medical bills totaling $1,594.21, all of which were paid by State Farm. They also demanded settlement for policy limits after having consulted their attorney. When State Farm persisted in offering $15,000, Bigger and his mother established January 27, 1989, as a deadline for State Farm to settle at their figure, after which they intended to turn the case over to their attorney. Diane Jones repeatedly advised both Bigger and his mother that her supervisor only authorized Jones to pay $15,000 to settle the case. Even after being admitted to the VA hospital, Bigger called Jones several times to inquire whether Jones had authority to settle for $25,000 and Jones again reported on each occasion that she only had $15,000 to settle. Finally, under pressure from his mother and out of a need to pay personal bills, Bigger decided to settle at State Farm's figure. He called Jones to set up a meeting to consummate the settlement and his mother confirmed the appointment, arranging to pick up Jones and bring her to the hospital. Jones advised Bigger that she would bring a check for the $15,000 and some papers to sign.
 
 
 10
 When Dr. Gorin, Bigger's doctor, learned that a settlement offer had been proposed, he informally evaluated Bigger to determine whether he was competent to enter into the settlement agreement. Although no formal competency evaluation was completed, Dr. Gorin stated that he spoke with the clinical staff and with experts in the field of psychology and psychiatry. He also reported speaking with Bigger's attorney in Petersburg, Charles Cuthbert, whom Bigger had retained immediately after the shooting incident to file a claim for social security disability benefits and to consult with Bigger about his personal injury claim, although Cuthbert's file does not confirm the conversation. As the result of these inquiries, Gorin concluded that Bigger was competent to sign the agreement and described Bigger's general mental state at the time as follows:
 
 
 11
 He can function from day-to-day basis and do activities of daily living and go out and, you know, balance his checkbook and go out and do the laundry and buy clothes and buy food, okay? But at any given time he's on the road and he may have seen a car similar to the one that was involved in the accident, he may go into a flashback or fit of rage because of what had happened and what he feels, okay? So there is a difference between good shape mentally, which he's not in, and being competent, at least in my opinion.
 
 
 12
 On January 27, 1989, Diane Jones met with Bigger in his hospital room to complete the settlement. Also present were Dr. Gorin and Lucy Bigger, Bigger's mother. At that time Bigger signed a "Release" and "Release and Trust Agreement" and was given a check for $15,000. The documents were witnessed by Dr. Gorin and Lucy Bigger.
 
 
 13
 According to Jones, when she came to the hospital that day, Bigger was "pleasant, very well groomed, and ... sitting up in bed." Before presenting the documents for signature, Jones said she explained the settlement to Bigger as follows:
 
 
 14
 I explained to him that I was there to, you know, bring him the check that I told him about and that he would be expected to sign a release that would release all claims, and that he would not be able to sue the company or the insured if he signed it. And he said he understood that, and he did say that, you know, he was sorry that I couldn't get the 25 [$25,000], because that's what he wanted, but he was willing to accept the 15 [$15,000], and that he thought once this whole thing was over, he would get it out of his mind.
 
 
 15
 Describing the same day and events, Bigger testified that he signed the papers because his mother wanted him to and he did not want "to make a scene." He stated he did not read the papers, but he under stood that he was not getting the $25,000 that he demanded and that $15,000 was all that he was getting. As he explained in his own words:
 
 
 16
 Q:You knew when you took the check that that was going to be all that it was going to be, right, you weren't going to get any more money from State Farm?
 
 
 17
 A:I think that that was-I think that's what maybe what was explained to me.***
 
 
 18
 A:She [Jones] was just saying, "This is all the money they are going to give you," because of my military training and I just felt like, if this is it, my mother seemed like that she wanted to do the settlement. I just signed the papers, that's what I did.
 
 
 19
 Bigger explained further that he was under pressure from his mother to settle. His mother paid Bigger's bills and Bigger was behind in rent and car payments. He stated that his mother used the money that he received to pay the bills and the difference between the sale of his old car and the purchase of a new one.
 
 
 20
 Describing Bigger's competence at the specific time that he signed the documents, Dr. Gorin testified:
 
 
 21
 I spoke with him personally on the day he did sign the document, that I did witness it asking is he sure this is what he wanted to do, and I was comfortable with the fact that he understood the consequences of signing this document in terms of being unable to receive any other money down the road.
 
 
 22
 Over a year and a half after Bigger signed the release and received the money, he filed this action to set aside the release, contending that he was incompetent at the time and that he was coerced to sign the settlement papers.
 
 
 23
 None of the facts surrounding the circumstances of the settlement are disputed, and the only basis on which Bigger attempts to create a question of fact is the conclusion reached later by an expert witness, who did not interview Bigger but only reviewed the medical records, that "based upon my review of these reports, it is my considered opinion that William Bigger was not competent to understand the nature of the documents he signed on January 27, 1989, and the character of the transaction he undertook on that date." The district court rejected the contention that this conclusory statement created a question of fact and granted State Farm's motion for summary judgment.
 
 
 24
 The standard under Virginia law for determining competence is not disputed. A person is considered competent to make a contract if he "has sufficient mental capacity to understand the nature of and the effect of the transaction to assent to its provisions." Price's Ex'r v. Barham, 137 S.E. 511, 512 (Va. 1927). A person is presumed to be competent to enter into a contract, and the burden is on the party seeking to avoid the contract to "strictly establish[ ]" his incompetence. Chesapeake & Ohio Ry. Co. v. Mosby, 24 S.E. 916, 916 (Va. 1896). Weakness of mind short of insanity, immaturity of reason, or lack of experience or skill is not by itself sufficient to afford relief from a contract. See id.
 
 
 25
 In this case Bigger had limited intellectual capacity and was suffering from post-traumatic stress disorder. While the evidence presents a factual dispute about whether an adequate psychological evaluation could have been made by Dr. Gorin or anyone else on January 27, 1989, the circumstances under which the release was signed are not disputed. See Price's Ex'r, 137 S.E. at 512 ("The testimony of attesting witnesses to documents and of others present at their execution is entitled to peculiar weight."). Bigger was fully aware that $25,000 was the maximum amount that he could receive and repeatedly he sought to receive that amount. When his efforts and those of his mother failed to move the insurance company from its standing offer of $15,000, he accepted the figure knowing he would receive no more. While the specific terms of the release were not read by him, or might not even have been fully understood by him had he read them, he did understand that he was giving up his claim against State Farm and that he would receive no more money in respect of his claim. Any pressure to sign the settlement papers came from his mother and his perceived need to pay his bills, not from the insurance company. Indeed, the settlement meeting in the hospital was initiated by Bigger and his mother. In these circumstances, Bigger has failed to make a prima facie showing that he lacked the capacity "to understand the nature and effect" of the release and to agree to give it, a showing on which he has the burden of proof, see Mosby, 24 S.E. at 916.
 
 
 26
 The same facts fail to support any claim of duress, undue influence, bad faith, or fraud by State Farm. The most that the record shows in this regard is that State Farm persisted in standing by its initial offer of $15,000 and Diane Jones, its representative, came to the hospital and was present when Bigger signed the release and received the $15,000. No threatening statements or statements of pressure are attributed to her or to State Farm.
 
 
 27
 Finally, Bigger's claim that the release was a mutual mistake has no factual support in the record.
 
 
 28
 On the record that we have, we conclude that Bigger was competent to release his claim for $15,000, and no facts have been presented which justify our setting it aside. See Matsushita, 475 U.S. at 587. The judgment of the district court is therefore
 
 
 29
 AFFIRMED.